**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Dennis J. MURRAY, Defendant–**
**Appellant.**

**No. 91–7261.**

United States Court of Appeals,
Fifth Circuit.

April 1, 1993.

---

Martha G. Carson, D'Iberville, MS (Court-appointed), for defendant-appellant.

Thomas E. Payne, Asst. U.S. Atty., George Phillips, U.S. Atty., Biloxi, MS, for plaintiff-appellee.

Before DUHÉ, and BARKSDALE, Circuit Judges and HUNTER[1], District Judge.

EDWIN F. HUNTER, Jr., Senior District Judge.

On November 6, 1992, a five count indictment was returned against defendant-ap-

---

1. Senior Judge of the Western District of Louisi-   ana, sitting by designation.

pellant, Dennis Murray, for his alleged role in an illegal firearms transfer. The basis of the indictment was that Murray, a previously convicted felon, participated with, and facilitated Glenn Reid in the sale of a sawed-off shotgun and a .38 caliber revolver to acting, undercover agents for the Bureau of Alcohol, Tobacco, and Firearms. After trial by jury, defendant was found guilty on four charges. We affirm Murray's conviction on Counts II, III, and IV. Murray's conviction on Count V is reversed for insufficient evidence.

### Background

In April of 1990, Dennis Murray went to work for Glenn Reid at Reid's business, "Fat Charlie's Buy and Sell". While at the pawn shop, Murray performed a variety of tasks including, receiving broken appliances, repairing appliances, and moving heavy items around the store. Whenever Reid was away from the store, Murray was often left in charge of the business.

Reid's business encompassed more than just buying and selling appliances. He was also a licensed gun dealer; and consequently, guns were kept in the shop under lock and key. Due to his previous felony conviction, Murray was not allowed to handle the guns.

The Bureau of Alcohol, Tobacco, and Firearms ("ATF") began an investigation of "Fat Charlie's" when Thomas Walker, an ex-police officer, notified them of possible illegal gun transactions. Under the auspices of the ATF, Walker secured the assistance of Jerry Atkinson, a former employee at "Fat Charlie's". They agreed to participate in an undercover ATF investigation to purchase illegal firearms from Glenn Reid.

On April 20, 1990, Atkinson (in a recorded conversation) telephoned Reid, and arranged for the purchase of an unregistered, sawed-off shotgun, plus other handguns. Reid agreed to supply the weapons, despite his knowledge that Atkinson was a previously convicted felon, and could not purchase firearms through legitimate channels.

On April 26, 1990, Reid asked Murray to take a ride with him in his van. Reid placed a rectangular styrofoam box between the front seats. From one end of the styrofoam, the stock of a shotgun was clearly visible. The barrel of the gun extended from the opposite side. Despite the obvious nature of the box's contents, Murray contends that he never suspected that the styrofoam contained a firearm.

Reid and Murray drove to Atkinson's house, where Reid and Atkinson were to consummate the firearm transaction. Unbeknownst to Reid and Murray, Atkinson had a hidden microphone taped to his body. Special Agent Wright of the ATF hid in another room of the house, monitoring and recording the proceedings. Murray carried the styrofoam package inside the house, and waved it about exclaiming, "Smile, I'm taking your picture." Subsequently, Murray handed the styrofoam-encased shotgun to Atkinson, who turned it over to Walker. The styrofoam package was opened, and the shotgun exposed to view. Reid also offered to sell a .38 caliber revolver to the ATF informants, which they agreed to buy.

The conversation between the men focused upon the purchase of the firearms and the characteristics of the weapons. Murray took an active role in the dialogue. Instead of indicating surprise or apprehension upon learning the true purpose of the visit, Murray laughed, joked, and contributed as if he knew all along what had been planned. When Atkinson asked Reid whether the shotgun would fire, Murray responded, "Na. That son of a bitch will shoot." When Reid was asked whether he had any shells for the shotgun, Murray volunteered, "I think you do have, didn't somebody come by there and sell you a bunch of them the other day? ... Did you buy them from that boy, he had a box full of them." After the discussion ended, Reid was paid. The weapons were left with the informants.

Dennis J. Murray was charged with a five count indictment. The charges included: I) conspiracy with Glenn Reid to violate federal firearms law, 18 U.S.C. § 371; II) possession by a previously convicted felon

of a firearm which had been transported in interstate commerce—18 U.S.C. § 922(g)(1); III) aiding and abetting Reid in the transfer of an unregistered firearm—26 U.S.C. §§ 861(c) and 5871; IV) possession of an unregistered firearm—26 U.S.C. §§ 5861(d) and 5871; and V) aiding and abetting Reid in the sale of a firearm to a convicted felon—18 U.S.C. § 922(d)(1).

Murray was tried by jury on September 9, 1991. At the close of the government's case, the court granted an acquittal on Count I, and as to the sale of a .357 Magnum listed in Count V, due to insufficient evidence. The remaining charges went to the jury. Murray was found guilty on Counts II, III, IV and V. Appellant was sentenced to thirty months imprisonment on each count to run concurrently, plus two years supervisory release. Murray appeals the sufficiency of the evidence, and questions the admission of Reid's guilty plea. We consider these issues in turn.

*Sufficiency of the Evidence*

Counts II–IV

■ The appropriate standard of review is whether, "any rational trier of fact could have found the essential elements beyond a reasonable doubt." *United States v. Webster*, 960 F.2d 1301 (5th Cir.), *cert. denied*, in *Nelson v. United States*, — U.S. ——, 113 S.Ct. 355, 121 L.Ed.2d 269 (1992); *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). A conviction challenged for insufficiency of the evidence must be considered in the light most favorable to the prosecution. *United States v. Hopkins*, 916 F.2d 207 (5th Cir.1990); *Jackson v. Virginia*, 443 U.S. at 318–319, 99 S.Ct. at 2789.

The basis for Murray's appeal on Counts II–IV is that he remained unaware of the contents of the styrofoam package until after the transfer. Thus, he argues that he could not possibly have knowingly pos-

sessed the firearm as required to sustain the conviction. *United States v. Parker*, 566 F.2d 1304, 1306 (5th Cir.1978), *cert. denied*, 435 U.S. 956, 98 S.Ct. 1589, 55 L.Ed.2d 808 (1978).

The evidence reveals that the styrofoam-encased shotgun rested under the counter at "Fat Charlie's" for a considerable time; and that Murray picked up the package from inside the van, and carried it to the transfer site. Then, too, Murray waved the shotgun around, and pointed it at the undercover agents exclaiming, "Smile, I want to take your picture." Obviously, either Murray thought he was carrying a camera, or he was making a joke, knowing full well that the styrofoam contained a shotgun. We reject defendant's argument that the evidence did not suffice to prove beyond a reasonable doubt that he knowingly possessed the firearm.

Count V

■ Murray was convicted of aiding and abetting co-defendant, Reid, in the sale of firearms to a previously convicted felon (Atkinson) in violation of 18 U.S.C. § 922(d)(1).[2] The statute requires that the perpetrator either know or have reasonable cause to believe that the transferee was a previously convicted felon. Murray argues that the evidence is insufficient to establish beyond a reasonable doubt that he knew that Atkinson had been previously convicted. The government implicitly argues that even if the evidence is insufficient to conclude that Murray personally knew that Atkinson was a convicted felon, it is undisputed that co-defendant, Reid, was aware of Atkinson's status, and this knowledge was attributable to Murray as an aider and abettor.

The only evidence presented by the government that Murray had personal knowledge of Atkinson's prior conviction was testimony by Atkinson and Bobby Williams (a friend of Glenn Reid's). Atkinson stated

**2.** 18 U.S.C. § 922(d)(1) provides in pertinent part:

It shall be unlawful for any person to sell or otherwise *dispose of any firearm or ammunition to any person knowing or having reasonable cause to believe* that such person is

(1) under indictment for, or has been convicted in any court, of a crime punishable by imprisonment for a term exceeding one year. (emphasis added).

that Reid used to joke about Atkinson's conviction "all the time" in front of Murray and other employees. But, there was no proof offered that Murray was definitely present on any specific occasion, or that he was within earshot of the conversations. Williams merely testified that it was common knowledge around "Fat Charlie's" that Atkinson was a previously convicted felon. On no occasion prior to the transfer had Murray actually met or talked with Atkinson. Atkinson's prior conviction was not discussed or referred to at the time of the firearms sale. No witness testified that Murray was present, or that Murray definitely overheard references to Atkinson's prior criminal history. We find that the evidence was not sufficient to support the conclusion that defendant was aware of Atkinson's record.

Having decided that the evidence was insufficient to establish that Murray was personally aware of Atkinson's conviction, our next focus is to consider whether a principal may supply the requisite criminal knowledge or intent which is necessary to satisfy a conviction against an aider and abettor.

In order to sustain a conviction for aiding and abetting, the government must demonstrate that the defendant: 1) associated with a criminal venture; 2) participated in the venture; and 3) sought by action to make the venture succeed. *United States v. Martiarena*, 955 F.2d 363, 366 (5th Cir.1992). "Association" means that the defendant shared in the criminal intent of the principal. "Participation" means that the defendant engaged in some affirmative conduct designed to aid the venture. Mere presence and association are insufficient to sustain a conviction for aiding and abetting. *Id.* The essence of aiding and abetting is a "community of unlawful intent" between the aider and abettor and the principal. *United States v. Pena*, 949 F.2d 751, 755 (5th Cir.1991). Although the aider and abettor need not know the means by which the crime will be carried out, he must share in the requisite intent. *United States v. Westbo*, 746 F.2d 1022, 1025 (5th Cir.1984). Under 18 U.S.C. § 922(d)(1), it is

the purchaser's status as a felon which makes the activity criminal. If the aider and abettor does not know this fact, it is difficult to say that he shared in the criminal intent of the principal.

There is no doubt that Murray was in possession of an unregistered firearm. But, since 28 U.S.C. § 922(d)(1) is an added offense with enhanced elements, it was incumbent upon the prosecutor to establish that Murray knew or had reasonable cause to believe that Atkinson was a convicted felon. *United States v. Longoria*, 569 F.2d 422, 425 (5th Cir.1978). The mental state of the principal alone, is insufficient to inculpate an aider and abettor. *United States v. Williams*, 985 F.2d 749 (5th Cir. 1993); *United States v. Beck*, 615 F.2d 441 (7th Cir.1980). Murray may very well have known that Reid was going to transfer unregistered firearms, but he did not know (or at least there is precious little evidence to show) that Reid was committing the additional offense of selling firearms to a felon. The very intent which makes this conduct criminal is the knowledge or reasonable belief that the transferee is a previously convicted felon. We must conclude that the evidence adduced by the government at trial, when viewed most favorably to the verdict, cannot support an inference of guilt as to Count V.

### Prejudicial Reference

Murray's co-defendant, Reid, testified in favor of the defense. Before tendering the witness, defense counsel elicited the fact that Reid pled guilty to conspiring with Murray to violate the federal firearms laws. On cross-examination, the prosecutor extensively questioned Reid concerning the apparent inconsistencies between his testimony at Murray's trial, and the implications of his guilty plea to the conspiracy charge. Despite these references to Reid's guilty plea, the judge was never requested to, nor did he *sua sponte* instruct the jury on the limited evidentiary purpose of the co-defendant's guilty plea. Also, defense counsel made no objection at trial. Accordingly, we review this issue under the plain error standard, examining

whether the error seriously affected the defendant's substantial rights. *United States v. Leach*, 918 F.2d 464, 467 (5th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2802, 115 L.Ed.2d 976 (1991) (citing *United States v. Mattoni*, 698 F.2d 691 (5th Cir.1983)). Plain error is an error, "so obvious that our failure to notice it would seriously affect the fairness, integrity, or public reputation of [the] judicial proceedings and result in a miscarriage of justice." *United States v. Fortenberry*, 914 F.2d 671, 673 (5th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1333, 113 L.Ed.2d 265 (1991) (citing *United States v. Graves*, 669 F.2d 964, 971 (5th Cir.1982)).

■■■ In *United States v. Black*, the Court enumerated the factors to be considered when evaluating the impact of a witness' guilty plea. They include: 1) the presence or absence of a limiting instruction; 2) whether there was a proper evidentiary purpose for introduction of the guilty plea; 3) whether the plea was improperly emphasized or used as substantive evidence of guilt; and 4) whether the introduction of the plea was invited by defense counsel. *United States v. Black*, 685 F.2d 132, 135 (5th Cir.), *cert. denied*, 459 U.S. 1021, 103 S.Ct. 387, 74 L.Ed.2d 518 (1982); *United States v. Leach*, 918 F.2d at 467; *United States v. Borchardt*, 698 F.2d 697, 701 (5th Cir.1983). Our analysis of the facts reveal that two of the four factors are present. First, the prosecution clearly had a proper purpose in emphasizing the guilty plea. The plea served to impeach the witness' testimony. Second, it was the defendant who originally introduced the guilty plea. Moreover, the defendant did not object to the prosecutor's questioning, nor did he request a limiting instruction from the judge. See *United States v. Cook*, 461 F.2d 906 (5th Cir.), *cert. denied*, 409 U.S. 949, 93 S.Ct. 269, 34 L.Ed.2d 219 (1972) (found no plain error when defendant's attorney introduced co-defendants' guilty pleas) and *United States v. Bass*, 562 F.2d 967 (5th Cir.1977) (no plain error where:

government elicited guilty pleas, no objection by defense, and defense emphasized guilty pleas on cross-examination).

Similarly, in *United States v. Howard*, the Court found no plain error where the same two *Black* factors were present as in the case *sub judice*. *United States v. Howard*, 961 F.2d 1571 (5th Cir.1992) (unpublished opinion)[3]. The facts in *Howard* are virtually identical to the facts in this case. Not only did defense counsel not object to the testimony, he was the one who introduced it. *Howard, supra*. Murray suffered no plain error as a result of Reid's guilty plea.

## Conclusion

We affirm Murray's conviction on Counts II, III, and IV. Murray's conviction on Count V is reversed. A review of the presentencing report indicates that the reversed charge factored into defendant's sentence calculation, and accordingly, resentencing is necessary.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

## APPENDIX

IN THE UNITED STATES
COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 91–1485

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

EMMA J. HOWARD,

Defendant–Appellant.

Appeal from the United States
District Court

for the Northern District of Mississippi

(CR–E–90–114–D)

(April 21, 1992)

Before KING, JOHNSON, and DAVIS, Circuit Judges.

---

3. According to local rule 47.5.3, unpublished opinions are precedent, but may only be cited when: "1) it establishes the law of the case, 2) is relied upon as a basis for *res judicata* or collat-

eral estoppel, or 3) involves related facts." Finding the circumstances in *Howard* closely related to the facts herein, a copy of the opinion is attached.

PER CURIAM: [1]

Emma Howard appeals from her convictions for food stamp fraud. Finding no reversible error in the proceedings below, this Court must affirm Howard's convictions.

## I. Facts and Procedural History

Prompted by a complaint from the chief of police in Aberdeen, Mississippi the Inspector General of the United States Department of Agriculture began an investigation of one C.R. Suggs, owner of Southern Grocery. In October 1989 Agent David L. Thomas, posing as a cocaine dealer, went to Southern Grocery and sold Suggs $130 worth of food stamps for $100. When Agent Thomas returned the next day to sell Suggs more food stamps, he could not find Suggs at the Southern Grocery, so he went next door to the Southside Quick Mart. Shortly after Agent Thomas arrived at the Quick Mart Suggs came out of the rear of the store. Suggs had previously owned the Quick Mart, but had transferred ownership of the business to Emma J. Howard in 1988. Suggs, however, still lived behind the store. Also, he still owned the land on which the Quick Mart sat, and collected rent from Howard. Suggs is white; Howard is black. At the time of Howard's trial, Suggs was 64 years old, and Howard was 24.

Agent Thomas offered to sell Suggs $375 in food stamps. Suggs agreed to buy them. Suggs asked Howard, who was behind the counter, to add up the food stamps on the calculator, and asked her if she had any money. Howard did not give Suggs any money; Suggs found the cash he needed in his own pockets. Suggs took the food stamps from Agent Thomas and began to count them. When Agent Thomas remarked on how fast Suggs counted the stamps, Howard interjected that Suggs had to count them quickly in order to get them out of the way.

The next week, Agent Thomas returned to the Southern Grocery early one morning and told Suggs that he had $500 worth of food stamps to get rid of. According to Agent Thomas' testimony, Suggs called Howard, telling her that the man selling food stamps had returned and asking if she had any money. Howard appeared at the grocery about 15 minutes later and told Suggs that she did not have any money. Suggs left Howard and Thomas together, and went to the Quick Mart himself to see if he could find any money. Suggs came back about 10 minutes later and gave Agent Thomas $150 for $195 worth of food stamps. Suggs told Agent Thomas he would buy Thomas' remaining stamps after Howard went to the bank to get some cash.

Agent Thomas returned to the Southern Grocery later that morning and Suggs gave him $187.50 for $250 in food stamps. Howard was not present. Some of the food stamps which Agent Thomas sold to Suggs on this last occasion were recovered from the Federal Reserve Bank with the Southside Quick Mart's endorsement stamp on their reverse.

In August 1990 Suggs and Howard were named as co-conspirators in a five count indictment. Howard was named in four counts: Count 1 charged that she had conspired with Suggs to acquire and present food stamps in violation of 18 U.S.C. § 371 and 7 U.S.C. §§ 2024(b), 2024(c); Counts 3 and 4 charged that she had aided and abetted Suggs in the acquisition and possession of more than $100 worth of food stamps, in violation of 18 U.S.C. § 2 and 7 U.S.C. § 2024(b); and Count 5 charged Howard with aiding and abetting Suggs in presenting more than $100 worth of food stamps for redemption in violation of 18 U.S.C. § 2 and 7 U.S.C. § 2024(c). Suggs pled guilty to all charges against him, including Count 1, the charge that he had conspired with Howard.

Howard was tried by a jury and found guilty on all four counts alleged against

1. Local Rule 47.5 provides: "The publication of opinions that have no precedential value and merely decide particular cases on the basis of well-settled principles of law imposes needless expense on the public and burdens on the legal profession." Pursuant to that Rule, the court has determined that this opinion should not be published.

her. The district judge sentenced Howard to three years' probation on each count, each term to run concurrently. In addition, Howard was fined a total of $500 and ordered to pay restitution in the amount of $192.50 and a special assessment of $200. Howard appeals.

## II. Discussion

Howard advances four grounds of error, each of which contests the district court's decision to admit some item or items of evidence. Although Howard's complaints have some merit, none rises to the level of reversible error.

### A. *The Tape Recordings*

Unknown to either Suggs or Howard, Agent Thomas was carrying a concealed tape recorder during his meetings with them. At trial, the Government offered into evidence the tape recordings of the conversations between Thomas, Suggs, and Howard. The Government also offered transcripts of the tapes, in order to assist the jury in hearing what was said on the tape. The trial court admitted both over Howard's objections. Howard objected on grounds that significant portions of the tapes are indistinct or inaudible, such that the tapes are rendered untrustworthy. She also complains that because the tapes are inaudible or unintelligible it was error to admit the transcripts, because there is a substantial danger that the jury placed undue weight on the transcripts, transcripts which could necessarily be no more reliable than the tapes.

The rule is well settled in this circuit that "[t]ape recordings which are only partially intelligible are admissible unless [the unintelligible] portions are so substantial as to render the recording as a whole untrustworthy." *United States v. Nixon*, 777 F.2d 958, 973 (5th Cir.1985). Also, the Fifth Circuit has recognized that it may be of help to the jury to allow it to read a transcript while listening to a tape recording. *See United States v. Wilson*, 578 F.2d 67, 69 (5th Cir.1978). Thus, transcripts are admissible to aid the jury in

understanding a recording, including cases in which "the transcript may be helpful either to identify the speakers or to understand portions which are difficult to hear." *Id. See also United States v. Larson*, 722 F.2d 139, 144 (5th Cir.1983). The determinations of whether the tape as a whole is untrustworthy and whether the jury should be allowed to use a transcript are determinations left to the sound discretion of the trial court, and this Court will not reverse the trial court except upon a showing of an abuse of that discretion. *United States v. Lance*, 853 F.2d 1177, 1181 (5th Cir.1988); *Larson*, 722 F.2d at 144.

The district court did not abuse its discretion in admitting either the tapes or the transcripts. The tapes were properly authenticated by Agent Thomas, who described the equipment he used, identified the speakers on the tapes, and testified that the tapes were accurate recordings of the conversations he had had with Suggs and Howard. The only question is whether the inaudible or unintelligible portions of the tapes render the tapes as a whole untrustworthy. Having conducted its own review of the tapes, this Court is satisfied that the district court did not abuse its discretion in ruling that the tapes are not untrustworthy. The tapes certainly could be clearer—there is considerable background noise and the voices of Howard and Suggs are often difficult to hear. However, their voices can be heard and their words can be made out. While there are some words that are unintelligible, these are relatively few, and no significant portion of the conversation is lost. Perhaps most importantly, the tapes recorded relatively clearly the portions of the conversations that were most strongly probative of Howard's guilt. The tapes make clear that Howard met Agent Thomas, that she was present when the illegal transactions took place, and that she participated in those transactions. In sum, the tapes provide an adequate reproduction of the conversations between Agent Thomas, Suggs, and Howard. There is no basis on which to conclude that the district court abused its discretion in deciding to admit the tapes.

Similarly, it was not an abuse of discretion to admit the transcripts, a transcript being, of course, a typewritten copy of the recorded tape. Initially, it must be noted that the trial court was especially careful in admitting the transcripts. The court itself closely questioned Agent Thomas about the accuracy of the transcripts. 3 R. 220, 227–29. In addition, the court carefully monitored the use of the transcripts: they were not passed out to the jury members until the tape recordings were played, and they were taken away from the jury immediately after the tapes were finished. 3 R. 223–24, 230.[2] Most importantly, though, the court gave the jury clear and comprehensive limiting instructions before the transcripts were distributed. Before the first transcript was given to the jury, the court instructed the jury as follows:

Ladies and gentlemen of the jury, Exhibit 7 has been identified as a typewritten transcript of a conversation that is alleged to have occurred on October the 19th, 1989. The conversation can be heard on the tape recording which has been received in evidence ... as Government's Exhibit No. 5. The transcript also purports to identify the speakers engaged in this conversation.

Now, I have admitted the transcript for the limited and secondary purpose of aiding you in following the content of the conversation as you listen to the tape recording, and also to aid you in identifying the speakers. However, you are specifically instructed that whether the transcript correctly or incorrectly reflects the content of the conversation or the identity of the speakers is entirely for you to determine, based upon your own evalua-

tion of the testimony you have heard concerning the preparation and the accuracy of the transcript and from your own examination of the transcript in relation to your hearing of the tape recording, itself, as the primary evidence of its content. And if you should determine that the transcript is in any respect incorrect or unreliable, you should disregard it to that extent. The primary evidence is the tape recording, itself.

3 R. 221–22.

The court gave a similar instruction before allowing the transcript of the second tape recording to be distributed to the jury.

Now, ladies and gentlemen of the jury, you will recall that I told you that you're specifically instructed that the transcripts that will be distributed to you, whether the transcripts correctly or incorrectly reflect the content of the conversations or the identity of the speakers, is entirely for you to determine based upon your own evaluation of the testimony you have heard concerning the preparation of the transcript, the accuracy thereof, and from your own examination of the transcript in relation to your hearing of the tape recording, itself. The tape recording is the primary evidence of its own content, and if you should determine that the transcript is in any respect inaccurate or unreliable, you should disregard it to that extent.

3 R. 229. In light of the fact that the transcripts were appropriately authenticated, the district court's care in admitting them, and the specific limiting instructions, this Court cannot conclude that the district court abused its discretion in admitting the transcripts.[3]

---

**2.** The level of the trial court's caution about the use of the transcripts is reflected in part by the court's directions to the prosecutor as the tapes were being readied to be played:

"Don't pass out the transcript until we're ready to play the tape. I don't want the jury studying this transcript until we're ready to play the tape."

3 R. 223.

**3.** In reaching this conclusion, we acknowledge the concerns raised by our colleagues on the Sixth Circuit. In a similar situation that Court

warned that a limiting instruction will not always be an adequate safeguard:

While this is an adequate instruction, its directives are only viable when the tape is clear enough for a juror to detect the tape is at variance with the transcript. But where, as here, the tapes are partially inaudible, the juror is precluded from making an intelligent comparison. Hence, the likely result is that the transcript becomes the evidence.

*United States v. Robinson,* 707 F.2d 872, 878 (6th Cir.1983). While the *Robinson* court is certainly correct that the transcripts would tend to be-

## B. *Howard's Relationship with Suggs*

Howard next complains about the Government's cross-examination of C.R. Suggs. Howard called only two witnesses: herself and Suggs. Suggs testified very briefly; the thrust of his testimony was that he alone had dealt with Agent Thomas and that he alone had broken the law. He maintained that Howard had not been present when Suggs was buying food stamps from Agent Thomas, and that Howard had never even met Thomas. 5 R. 4, 6. On cross-examination the Government sought to impeach Suggs' testimony by exposing the nature of the relationship between Suggs and Howard.

Q (By the Government): Now, where do you live, please, sir?

A (By Suggs): In the back of the Southside Quick Mart.

Q: Okay. And do you live with Emma Howard?

A: No, I don't.

Q: Where does she live?

A: She lives at 605 Boundary Street. It's there in that neighborhood.

Q: How many children do you have?

A: Two.

Q: How many of those were given birth to by Emma Howard?

A: Two.

(By defense counsel): Your Honor, I object.

(The Court): Yes. The objection is sustained.

(By defense counsel): May we approach the bench, Your Honor?

(The Court): Yes, sir. Disregard the last question and answer.

5 R. 11. At the bench, the prosecutor stated that the Government was attempting to show Suggs' bias. In particular, the prosecutor indicated that he wanted to show that Suggs had a stake in the outcome of the case by showing that Howard was the mother of Suggs' children and that

Howard and Suggs were living together. Defense counsel objected that the questioning was highly prejudicial. The court told counsel that it would stand by its ruling on the previous objection, but that the Government would be allowed to inquire into the fact of the relationship between Howard and Suggs. The cross-examination resumed.

Q (By the Government): Mr. Suggs, how old are you?

A (By Suggs): 64.

Q: How old is Emma Howard?

A: 24 or 25.

Q: How long have you been knowing her?

A: All her life.

Q: And have you and Emma Howard— first of all, let me ask you, are you married—

A: No, I'm not.

Q: —to her? How long have you and Emma Howard been dating, for lack of a better word?

A: We've got one daughter I think 13 years old.

Q: So would Emma have been, if my arithmetic is correct, approximately 11 years old when that child was born?

A: I believe so.

5 R. 13.

There can be no question that this testimony was prejudicial. The question before this Court, however, is whether the district court abused its discretion in ruling that the testimony was sufficiently relevant to allow it despite its potential to prejudice the jury. *See* Fed.R.Evid. 403. As with the questions of the tapes and transcripts, this Court again cannot conclude that there was such an abuse of discretion. The evidence was unquestionably relevant. Both the Supreme Court and this Court have made plain that the Government had the right to inquire into the relationship between Suggs and Howard, to expose any potential bias on Suggs' part. *See United*

---

come the evidence in a case where the tapes were too inaudible to allow the jurors to evaluate the accuracy of the transcripts, the point here is that the tapes in this case were not so inaudible. The tapes here, while not ideal, were

clear enough to allow the jurors in this case to determine whether the transcript was faithful to the words being spoken. Accordingly, the concerns raised by the Sixth Circuit, while valid, have no application here.

*States v. Abel,* 469 U.S. 45, 52, 105 S.Ct. 465, 469[, 83 L.Ed.2d 450] (1984) ("Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony."); *United States v. Hall,* 653 F.2d 1002, 1008 (5th Cir.1981) ("The exposure of possible motivations for false testimony is a fundamental element of cross-examination.... Thus, cross-examination into any motivation or incentive a witness may have for falsifying his testimony *must* be permitted.") (emphasis by court; citations omitted). The trial court properly attempted to minimize the prejudicial effect of Suggs' testimony by directing the prosecution to stay clear of the fact that Suggs and Howard had two children. Unfortunately, Suggs returned to that topic of his own accord, defeating the trial court's efforts. Although it certainly would have been preferable if the potentially prejudicial testimony could have been avoided, the trial court correctly allowed it, and it provides no basis for reversing Howard's conviction.

### C. *Suggs' Plea of Guilty to the Conspiracy Charge*

Third, Howard raises another objection to the Government's cross-examination of Suggs. In that cross-examination, the Government required Suggs to read the counts in the indictment that charged him with conspiring with Howard and with aiding and abetting her, and then asked him whether he had pled guilty to those charges. Suggs read the charges and acknowledged that he had pled guilty to them. 5 R. 8–10. Howard did not object. On appeal, Howard argues that it was prejudicial to allow this questioning.

This Court has repeatedly emphasized that when a conspiracy is alleged, the defendant must be convicted on the basis of the evidence against *that defendant,* not upon the basis of the evidence against the other conspirators. *See, e.g., United States v. Fleetwood,* 528 F.2d 528, 532 (5th Cir.1976); *United States v. Harrell,* 436 F.2d 606, 613–14 (5th Cir.1970). As Howard acknowledges, however, because there was no objection at trial to this line of questioning, this Court can reverse Howard's conviction on this basis only if the Court determines that it was plain error to allow the questioning.

The Government argues that it was not plain error to allow the questioning because the questioning had a proper purpose: impeachment of Suggs' testimony. Suggs testified that he had acted alone; he had pled guilty, however, to charges that he had conspired with Howard to commit the violations, and that he and Howard had aided and abetted each other in committing the violations. Howard acknowledges that it is permissible to admit the guilty plea of a co-conspirator under certain circumstances. The factors to be considered when determining whether to admit testimony regarding a co-conspirator's guilty plea include 1) the presence or absence of a limiting instruction, 2) whether there was a proper purpose in introducing the fact of the guilty plea, 3) whether the plea was improperly emphasized or used as substantive evidence of guilt, and 4) whether the introduction of the plea was invited by the defense. *United States v. Black,* 685 F.2d 132 (5th Cir.1982). Howard argues that because there was no limiting instruction, and because the prosecutor improperly emphasized the plea by engaging in extended questioning of Suggs about his plea, the district court committed plain error by allowing the testimony.

We disagree. Plain error is error which is "so obvious that failure to notice it would seriously affect the fairness, integrity, or public reputation of judicial proceedings." *United States v. Todd,* 735 F.2d 146, 149 (5th Cir.1984) (internal quotation marks omitted). The error here was not so obvious. As noted above, the Government had a proper purpose for introducing the evidence. Also, the defense did tend to invite impeachment of Suggs when it put on his testimony that he had acted alone. Thus, there are present here two of the factors which are relevant to the determination of whether it was proper to admit

the guilty plea, so that it is not possible to say that allowing that testimony was plain error. Moreover, the Court notes that if Howard had objected to the prosecutor's questions at trial, the trial court would have had an opportunity to give a proper limiting instruction and to curb any improper emphasis upon the plea. In any case, though, the Court perceives no plain error in the record before us.

### D. Evidence of Prior Acts of Food Stamp Fraud

Finally, Howard argues that it was error to allow the Government to introduce into evidence a 1986 letter from the Department of Agriculture addressed to "Cecil Ray Suggs, Owner, Southside Quik Mart." The letter referred to a visit to the Quick Mart by an agent of the Food and Nutrition Service, reciting that this agent had told Suggs that violations might be occurring at the Quick Mart, and that this agent had reviewed with Suggs the regulations governing acceptance of food stamps. The letter constituted an official warning that violations could lead to disqualification from the food stamp program. The letter also indicated that Suggs would be responsible for any violations committed by his employees. Howard contends that in introducing this letter the Government was attempting to convict her for prior acts of food stamp fraud, such that the letter should have been deemed inadmissible under Fed.R.Evid. 404(b).

In order to convict a defendant of the crime of acquiring food stamps in a manner not authorized by law, the Government must prove that the defendant knew that her acquisition of food stamps was illegal. See Liparota v. United States, 471 U.S. 419, 433, 105 S.Ct. 2084, 2092[, 85 L.Ed.2d 434] (1985). The Government thus contends that the letter sent to the Quick Mart, at a time when Emma Howard was the store manager, was relevant to the issue of whether Howard was aware that she was breaking the law when she participated in the transactions with Agent Thomas. Howard argues that the probative value of the letter was limited, because there was no proof that she had seen it. Thus, she concludes, the letter should not have been admitted, because it was more prejudicial than probative. See United States v. Beechum, 582 F.2d 898 (5th Cir.1978) (en banc), cert. denied, 440 U.S. 920[, 99 S.Ct. 1244, 59 L.Ed.2d 472] (1978). The district court's determination that the evidence was more probative than prejudicial is subject to reversal only for an abuse of discretion. See United States v. Gonzalez–Lira, 936 F.2d 184, 191 (5th Cir.1991).

The district court did not abuse its discretion. While the probative value of the letter may have been limited by the fact that there was no direct evidence that Howard had seen it, the letter nonetheless retained significant value. Howard was the store manager at the time that the agent of the Food and Nutrition Service visited the Quick Mart and at the time that the letter was sent, and the letter explicitly informed Suggs that he was responsible for the actions of his employees. The jury certainly could infer that even if Howard had not read the letter, due to her position at the Quick Mart and her relationship with Suggs that she was aware of the warning from the Food and Nutrition Service. Moreover, even if the probative value of the letter was limited, it seems fairly clear that the potential for prejudice was also limited. The letter does not mention Howard or indicate that she participated in any prior food stamp fraud. It is hard to see how the letter could have improperly influenced the jury to convict Howard on the basis of prior acts. In sum, there is no basis on which to hold that the district court abused its discretion in allowing the Government to introduce the letter, and there is no basis on which to reverse Howard's conviction.

### III. Conclusion

For the reasons stated, the judgment of the district court is affirmed.

AFFIRMED.