Anthony DIMARTINO,
et al., Petitioners,

v.

**Bradley A. BUCKLES, Director,
Bureau of Alcohol, Tobacco,
and Firearms, Respondent.**

No. Civ. JFM–00–1860.

United States District Court,
D. Maryland.

Jan. 2, 2001.

Benjamin Lipsitz, Lipsitz and Lipsitz, Baltimore, MD, for plaintiff.

Andrea Leahy-Fucheck, Asst. U.S. Atty., Baltimore, MD, for defendant.

## MEMORANDUM

MOTZ, District Judge.

Petitioners, Anthony DiMartino and Larry DiMartino, t/a Baltimore Gunsmith, and Larry DiMartino, Baltimore Gunsmith Co., appeal decisions by the Bureau of Alcohol, Tobacco, and Firearms ("ATF") denying an application for a firearms license and revoking an existing firearms license. Respondent, the ATF, has moved for summary judgment. That motion will be granted.

### I.

Anthony DiMartino and Larry DiMartino t/a Baltimore Gunsmith, 218–220 South Broadway, Baltimore, Maryland, are federally licensed firearms dealers. Anthony DiMartino has been a firearms dealer for over 20 years. His son, Larry DiMartino, has been involved in the business for at least 8 years. Petitioners applied with the

ATF for a renewal of their federal firearms dealer license. A federal firearms dealer license, issued pursuant to 18 U.S.C. § 921 et. seq., is required for firearms dealers. The ATF denied petitioners' renewal application on June 24, 1999. Petitioners requested a hearing on that denial. On November 2, 1999 and February 10, 2000, the ATF held administrative hearings on Petitioners' renewal application.

After the ATF denied Petitioners' renewal application, Larry DiMartino amended the corporate status of Baltimore Gunsmith and filed a separate application for a federal firearms dealer license. Other than the exclusion of Anthony DiMartino, the applications were substantially the same. They both concerned the same premises and the same inventory. On February 11, 2000, the ATF held hearings on Petitioners' application for a new license.

Over a series of years, the ATF investigated petitioners using a variety of means including undercover agents. The ATF's investigations provided the evidence used in the administrative hearings. On April 20, 2000, the Director of Industry Operations ("DIO") of the ATF issued a final denial of Petitioners' renewal application and a final denial of Petitioners' application for a new license. The DIO found that petitioners were unqualified to be firearms licensees. The denials were premised on 12 counts alleging firearms related violations of 18 U.S.C. § 921 et. seq. The evidence for the DIO's decision consisted of falsified federal records, possession of a weapon with an obliterated serial number, and several illegal transfers of firearms and ammunition. Many of the illegal transfers involved straw persons. The straw purchases generally involved the sale of a firearm to a prohibited buyer, such as a convicted felon or an out of state resident, while the paperwork was completed by an otherwise legal buyer.

## II.

■ This case is an appeal from the ATF's decision to not renew petitioners' federal firearms license and to not grant their application for a new license. *See* 18 U.S.C. § 923(f)(3). Under section 923(f)(3), petitioners are entitled to de novo judicial review in federal district court. The reviewing court can consider any evidence submitted by the parties regardless of whether that evidence was submitted in the administrative proceeding. The reviewing court can grant summary judgment without conducting an evidentiary hearing if no genuine issues of material fact exist. *See Al's Loan Office, Inc. v. Bureau of Alcohol, Tobacco, and Firearms*, 738 F.Supp. 221, 223 (E.D.Mich. 1990); *T.T. Salvage Auction Co. v. United States Treasury Dep't*, 859 F.Supp. 977, 979 (E.D.N.C.1994).

## III.

Under section 923, the ATF may revoke any federal firearms license if the holder of the license violates any federal statute or regulation dealing with the firearms industry. *See* § 923(e). In addition, an application for a federal firearms license can be denied if the applicant has violated any federal statute or regulation dealing with the firearms industry. *See* § 923(d)(1)(C). A *single* violation is sufficient for denying an application or revoking a license. The DiMartino's principal argument is that the evidence is insufficient to support the conclusion that they violated any federal statute or regulation concerning the firearms industry.

### A.

Under section 922(d)(1), it is a crime for any person to sell or otherwise dispose of any firearm or ammunition to convicted felons. Under section 922(b)(3), it is a crime for any person to sell a firearm to any out of state resident. Under both provisions, the seller must either know or have reasonable cause to believe that the buyer is prohibited. *See* 18 U.S.C.

§ 922(d)(1). Throughout Petitioners' response, they state that the straw purchases were legal because they did not have reasonable cause to believe that the buyer was prohibited. This argument takes two forms. First, petitioners seem to state that, because the weapons were obtained using proper paperwork, the sales were legal. In essence, petitioners seem to be arguing that the straw transactions worked, i.e. that they were legal even if the seller knew that the real purchaser was a prohibited buyer. This argument fails. *See, e.g., United States v. Straach,* 987 F.2d 232 (5th Cir.1993) (straw purchases are illegal under section 922).

The other form of this argument is that for each specific transaction, petitioners did not have reason to believe that the real purchaser was a prohibited buyer. Whether this argument is successful turns on the specific facts of each transaction. For example, in *United States v. Murray,* the evidence was insufficient to convict a firearms dealer of selling to a convicted felon in violation of section 922. 988 F.2d 518, 521–22 (5th Cir.1993). The evidence showed that people in the store used to joke about the buyer's prior conviction, but the evidence failed to show that the firearms dealer was ever present when the buyer's prior conviction was mentioned. *Id.* In contrast, in *Straach,* the evidence was sufficient to convict a firearms dealer for violating section 922. 987 F.2d at 238. An out of state buyer negotiated for, paid for, and took possession of several weapons. *Id.* The buyer had an associate fill out the paperwork. Based on this course of conduct, the jury found that the person filling out the paperwork was not the true buyer. *Id.* During the exchange, the buyer told the firearms dealer that he was from out of state. Based on this statement, the jury found that the firearms dealer had reasonable cause to believe that the true buyer was from out of state. *Id.*

1.

■ Counts 4–7[1] state that Larry DiMartino and Anthony DiMartino transferred firearms to Michael Russell, a resident of Georgia, in violation of 18 U.S.C. § 922(b)(3). Under section 922(b)(3), it is a crime for a Maryland firearms dealer to transfer a firearm to any person that the firearms dealer knows or has reasonable cause to believe does not reside in Maryland.[2]

Acting undercover, ATF Special Agents Michael Russell and Lisa Kincaid, wearing a hidden microphone and audiotape, completed four illegal purchases from Baltimore Gunsmith. On September 15, 1992, Russell selected a Colt Python 357 Magnum and negotiated a purchase price. He also told Anthony DiMartino that he was not a Maryland resident. (*See* Government Ex. # 6; Transcript of Administrative Proceeding ("Transcript") at 97–99.) Anthony DiMartino said that he could not sell the gun to Russell, but that they could have Kincaid, who was undercover as Russell's fiancé, fill out the paperwork. Anthony took the deposit directly from Russell. (*See* Government Ex. # 6; Transcript at 97–99.) On October 22, 1992, Russell returned to the store, and paid Larry DiMartino for the 357 Magnum. (*See* Government Ex. # 8; Transcript at 102–09.) On the same day, Russell negotiated with Anthony DiMartino and Larry DiMartino for the purchase of several additional guns. (*See* Government Ex. # 9; Transcript at 102–09.) Russell purchased an additional Uzi and a Smith and Wesson 38 special. (*See* Government Ex. # 8; Transcript at 102–09.) Russell paid for these guns and used Kincaid's paperwork. On November 23, 1992, Russell returned to Baltimore Gunsmith to pick up two Sig Sauer 9mm pistols he had ordered. Larry DiMartino sold the guns to Russell, who paid for them, and they used Kincaid's paperwork. (*See* Government Ex. # 10; Transcript at 112–14.) Larry Di-

---

1. The Counts in this Memorandum correspond to the DIO's Findings.

2. The petitioners have not asserted that the exceptions in section 922(b)(3) apply.

Martino handed the receipt and the money to Russell.

On January 26, 1993, Russell returned to the Baltimore Gunsmith. Russell picked up a Sig Sauer that he had ordered and negotiated for a Smith and Wesson revolver and a Desert Eagle 44 Magnum. Russell negotiated with and made payment to Larry DiMartino. (*See* Government Ex. # 12; Transcript at 115–17.) Larry DiMartino gave the change to Russell. They used Kincaid's paperwork. (*See* Government Ex. # 12; Transcript at 115–17.)

These facts are sufficient to prove that Baltimore Gunsmith on four separate occasions knowingly transferred firearms to Russell, who was not a Maryland resident, in violation of section 922(b)(3). Petitioners do not dispute these facts. Petitioners do dispute the conclusion that these facts show that Larry DiMartino had reasonable cause to believe he was transferring firearms to an out of state resident. Specifically, petitioners contend that, based on the above facts, a possible conclusion is that Larry DiMartino believed that he was transferring the firearms to Kincaid. They further contend that whether she gave the firearms to Russell as a gift is not their concern. Larry DiMartino, in the November 24th conversation with Russell, expressed his belief that the use of a straw intermediary would make the transaction legal. He told Russell, "I'm supposed to be talking with her and that's fine. . . . She could be giving them to you as a gift for all I know. . . . Because I don't got direct knowledge of what's going on, no, they're not going to come back to me." (Government Ex. # 10 at 7.) Larry DiMartino's mental gymnastics aside, the evidence can only be seen as proving that Larry DiMartino had reason to believe Russell was not a Maryland resident and that he was receiving the guns. *See, e.g., Straach,* 987 F.2d at 238. In addition to the long negotiations between Larry DiMartino and Russell, Larry DiMartino's statements during the November 24th conversation indicate that he was aware of the actual nature of the deal. During Russell and Larry DiMartino's conversation, Larry DiMartino became concerned that Russell was an undercover ATF agent. Larry DiMartino said to Russell, "The only problem I got with this is this you see—all my dealing have been with you and they're supposed to be with her. . . . For all I know, you could be from ATF and I'd be screwed because I know I'm talking to you and I'm supposed to be talking with her." (Government Ex. # 10 at 3.) At this point, Russell had purchased five firearms from Baltimore Gunsmith using Kincaid's paperwork.

2.

■ Count 8 states that Anthony DiMartino sold a firearm to John Gilden, a convicted felon, in violation of section 922(d)(1). On December 5, 1996, Gilden asked Anthony DiMartino if he could purchase a firearm. Gilden was wearing a hidden microphone at the time. According to the transcript of that conversation, Anthony DiMartino said, "You can't have any guns. You've got a record. . . . The only way you're going to get one, John between you and I, has to be between you and I, you got to get either your wife, girlfriend or somebody to come in and get it, because we can't have it." (Government Ex. # 16 at 12–16.) On December 16, 1996, Gilden called Anthony DiMartino. According to the transcript of that call, Gilden and Anthony DiMartino discussed the price and type of gun, and they agreed to have a woman named "Jen" come to the Baltimore Gunsmith to purchase the gun for Gilden. (*See* Government Ex. # 17a at 1–3.) Later that day, Special Agent Genevieve MacDonald, acting undercover as Jennifer McCarthy, went into the Baltimore Gunsmith and purchased a gun from Anthony DiMartino. (*See* Government Ex. # 18.) MacDonald told DiMartino that she was there to purchase the gun for Gilden and that she was paying with his money. (*See id.*) On January 7, 1997, Gilden called Baltimore Gunsmith, and An-

thony DiMartino said that Jen could pick up the gun. (*See* Government Ex. # 19.) On January 13, 1997, MacDonald obtained the gun from the Baltimore Gunsmith. (*See* Government Ex. # 21, ATF Form 4473.) These facts are sufficient to prove that Anthony DiMartino, through Mac-Donald, sold a gun to Gilden and that Anthony DiMartino had reasonable cause to believe that Gilden was a convicted felon in violation of section 922(d)(1).[3] Petitioners do not dispute these facts.

■ Anthony DiMartino was acquitted of charges in Maryland Circuit Court. The charges related to some aspects of his dealings with Gilden. (*See* Petitioner's Ex. # 1.) Under 18 U.S.C. § 923(f)(4), the ATF cannot deny or revoke a license based on facts that were the basis of a criminal proceeding in which the licensee was acquitted. However, section 923(f)(4) only applies to criminal proceedings "alleging any violation of this chapter or of rules or rules or regulations prescribed under this chapter." The criminal proceedings against Anthony DiMartino were for violations of Maryland law, not federal firearms violations. Therefore, the exemption in section 923(f)(4) does not apply.

### 3.

■ Count 9 states that Larry DiMartino transferred ammunition to Christopher Howard, a convicted felon, in violation of section 922(d)(1). On March 17, 1997 Howard entered Baltimore Gunsmith equipped with a hidden microphone. (*See* Government Ex. # 24, transcript of audiotape from March 17, 1997.) Larry DiMartino informed Howard that he had failed his background check and that he could not sell him a firearm. (*See id.*) Howard told Larry DiMartino that he had a drug conviction. (*See id.*) Despite this, Larry DiMartino then transferred ammunition to Howard. (*See id.*) Petitioners do not dis-

pute these facts. They do argue that, based on the audiotape, it is impossible to tell whether Howard actually paid for the ammunition. However, whether Howard paid for the ammunition does not matter. Section 922 only requires that a person "sell or otherwise dispose of" ammunition to a convicted felon. These facts are sufficient to demonstrate that Larry DiMartino disposed of ammunition to a convicted felon, and that Larry DiMartino had reasonable cause to believe that Howard was a convicted felon.

### 4.

■ Count 10 states that Baltimore Gunsmith transferred ammunition to Gilden on March 17, 1997. Gilden, equipped with a recording device, went into Baltimore Gunsmith. (*See* Transcript at 207–11.) He told Anthony DiMartino that he needed more ammunition for the guns he had purchased. Anthony DiMartino gave him the ammunition without charging him or without filling out any paperwork. (*See* Transcript at 207–11; Government Ex. # 26, photograph of ammunition.) Special Agent Murray had constant surveillance of the transaction. (*See* Transcript at 207–11.) These facts are sufficient to prove that Anthony DiMartino disposed of ammunition to someone he had reasonable cause to believe was a convicted felon in violation of section 922(d)(1). Petitioners do not contest these facts.

### 5.

Counts 1–3 state that Baltimore Gunsmith sold firearms to Anthony Jones, a convicted felon, in violation of 18 U.S.C. § 922(d)(1). Sheila Kelly and Chena Smith filled out paperwork for firearms while Jones selected and paid for the weapons. (*See* Government Ex. # 1, 2, Affidavits of Kelly and Smith.) Unlike the previous purchases using an intermediary,

---

**3.** The ATF asserts that the petitioners falsified records for this and other straw purchases. For Count 8, Baltimore Gunsmith did not accurately describe the sale in its records in

violation of 18 U.S.C. § 922(m). (*See* Government Ex. # 21, ATF Form 4473.) ATF Form 4473 lists Jennifer McCarthy as the purchaser, not Gilden. (*See id.*)

the ATF has not produced any direct evidence that anyone at Baltimore Gunsmith had reasonable cause to believe that Anthony Jones was a convicted felon. The suspicious nature of the purchase—Jones conducting the purchase while Kelly and Smith filled out the paperwork—may well be enough circumstantial evidence to prove that the petitioners should have had reasonable cause to believe that Jones was a convicted felon. Whether this is enough evidence at the summary judgment stage is a close question. Because the ATF's decision is clearly supported by other evidence, I need not decide whether a suspicious transaction, absent direct evidence, can support a grant of summary judgment in favor of the ATF.

### B.

Count 11 states that the Baltimore Gunsmith knowingly took possession of an Intratec Tec 22 caliber semi-automatic in violation of 18 U.S.C. § 922(k). Under section 922(k), it is a crime to knowingly possess or receive any firearm that has the manufacturer's serial number obliterated and that has been transported in interstate commerce. According to markings on the gun, the Intratec Tec 22 was manufactured in Miami, Florida. (*See* Transcript at 243.) As the gun was seized in Maryland, it must have been transported interstate. The Intratec Tec 22 did not have a serial number on it. (*See id.*) Baltimore Gunsmith had the Intratec Tec 22 in inventory and had recorded it. Under the entry for serial number for the Intratec Tec 22 was written "no serial number." (Transcript at 244) Petitioners do not dispute these facts. These facts are sufficient to prove that Baltimore Gunsmith knowingly received a firearm with an obliterated serial number and that the gun had moved interstate.

Petitioners do claim that someone from the Baltimore Gunsmith called local police and informed them about the gun. However, petitioners are unable to produce any evidence of this call, and they have not provided the names of the local police con-

tacted, or the time or date of this call. Petitioners self-serving, unproven statement that they made a call to local police is insufficient to create a material issue of fact. Petitioners should have known that, without the phone call, their possession of the Intratec Tec 22 was illegal. As firearms dealers in a heavily regulated industry, their failure to obtain proof of the call to the police was at their peril. They should have known to make some record of the call because the call was the only possible way their continued possession of the gun would not be illegal.

In their opposition to the ATF's motion for summary judgment, petitioners state, "[Larry DiMartino's] statement as to the ATF's persistent 'attempts by agents to set us up ... to investigate us, and make these attempts to entrap us' ... as well as his assertions that the 'inspection' at which the Tec 22 was seized was not an authorized, permissible, or permitted as a compliance inspection, as the ATF claims, and hence was illegal in the absence of a warrant, should suffice to create additional genuine disputes as to material facts." Petitioner's Response at 20. Petitioners do not cite any law and they do not suggest any evidence that might support their case on these points. Petitioners have not presented a sufficient legal argument on entrapment or illegal search and seizure.

### C.

Count 12 states that Baltimore Gunsmith violated record keeping requirements with respect to several ATF 4473 forms that were seized in 1998. The specific violation alleged is that the buyer of the firearm failed to answer certain questions relating to their background check. During the administrative hearing Thomas Stewart testified to these violations. In Government Ex. # 31, the ATF attached the forms that allegedly violated record keeping requirements. However, based on a review of the records, it is not clear that the forms were left blank. Several of the answers on the forms are circled or

have other unusual marks, but, based on a review of the exhibit, the questions appear to have been answered. The ATF may be able to explain the marks or otherwise prove that violations did occur. But, based on the record before the Court at the summary judgment stage, the ATF has not met its burden of proof with respect to Count 12. However, the ATF's decision is clearly supported by the evidence in Counts 4–11.

## IV.

 Petitioners claim that the combination of investigatory and adjudicatory functions in a single body, the ATF, violated their Due Process rights under the Fifth Amendment to the United States Constitution. The Supreme Court has squarely held that, without more, the mere combination of investigatory and adjudicatory functions in an administrative body is not a violation of Due Process. *See Withrow v. Larkin*, 421 U.S. 35, 54–55, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975).

Petitioners also argue that the ATF injured them by conducting hearings for both the renewal application and the application for a new license. This concern is a nonstarter as it was of the petitioners own doing. The Baltimore Gunsmith could only continue in business during the pendency of the litigation under petitioners existing license. *See* 27 C.F.R. § 178.78. If petitioners chose to drop their renewal application, they would not have been able to stay in business. Also, federal regulations require that in order for a license to be granted in only Larry DiMartino's name, a new application must be filed. *See* 27 C.F.R. § 178.54. Petitioners chose to stay in business during the pendency of the litigation and to attempt to acquire a new license under only Larry DiMartino's name. As a result, they were obliged to litigate both applications.

Any single violation of the federal statutes or regulations controlling the firearms industry can be a basis for denying an application for a new license or revoking an existing license. *See* 18 U.S.C. § 923. The violations in Counts 4–11 are more than sufficient to support the ATF's decision to not renew petitioners' license and to deny petitioners' application for a new license.

An order granting the ATF's motion for summary judgment is being entered herewith.

## *ORDER*

For the reasons stated in the accompanying memorandum, it is this 2nd day of January 2001 ORDERED that the ATF's motion for summary judgment is granted and the petition is dismissed with prejudice.