**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

Nos. 92-8108 & 92-8109

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

LOUIS G. REESE, III,

Defendant-Appellant.

Appeals from the United States District Court
for the Western District of Texas
(August 13, 1993)

Before WISDOM, JOLLY, and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

I.

Lewis G. Reese III (Reese) and his Dallas based companies were major developers of real estate in Texas. During the middle 1980's Reese financed several of his real estate deals with Lamar Savings and Loan Association (Lamar) and Western Savings and Loan Association (Western).

On August 7, 1990, Reese along with four Lamar officials, were indicted in the Western District of Texas, Austin Division, in Cause No. A-91-CR-85 for conspiracy to defraud the United States and its agency, the Federal Home Loan Bank Board, in violation of

18 U.S.C. §371. Count one of the indictment charged Reese as a co-conspirator involved with conduct to defraud the United States, to misapply federally insured funds in violation of Title 18 U.S.C. § 657; to cause false entries to be made in the books, reports and statement of Lamar Savings Association, a federally insured savings and loan, in violation of Title 18 U.S.C. § 1006; and to make false and fraudulent statements to the Federal Home Loan Bank Board in violation of Title 18 U.S.C. § 1001. On June 19, 1991, a one-count information was filed in the Northern District of Texas in Cause No. A-91-CR-85, charging Reese with conspiring to defraud the United States by impeding and impairing the lawful functions of the Internal Revenue Service, in violation of 18 U.S.C. § 371. The case was subsequently transferred to the Western District of Texas and consolidated with Criminal Cause No. A-90-CR-117, the Lamar case.

Although both cases arose out of Reese's real estate dealings, each case involved independent events.

A.  The Lamar Savings and Loan Association Case

Lamar was a savings and loan institution located in Austin, Texas. In 1985, The Federal Home Loan Bank Board (FHLBB) notified Lamar that there were deficiencies in its net worth related to real estate which Lamar had acquired through foreclosure (REO Properties); and that Lamar would be required to dispose of these REO properties in order to correct the deficiencies and to avoid a supervisory agreement ordered by FHLBB.

Lamar decided that it would be difficult to dispose of the REO properties in the ordinary course of business because the real estate market was poor at that time. Consequently, it devised a plan whereby borrowers would be required to purchase an REO property as a condition of receiving a loan on other property, thereby making it appear to the regulators that Lamar had sold off the REO property. Lamar would finance both the legitimate loan and the REO property sale by lending more money to the borrower than the original loan request would have required. Lamar executed its scheme by lending more money to a single borrower than permitted by the regulators and disguised these excess loans to one borrower by using nominee borrowers.[1] Lamar was therefore able to deceive the federal regulators as to Lamar's true financial condition.

In order to carry out its plans, Lamar contacted potential borrowers and let them know that Lamar was prepared to lend money but only under the above stated conditions.

Reese needed financing to purchase and develop a 225 acre parcel of land located in DeSoto, Texas (the DeSoto property). On June 29, 1985 Lamar agreed to lend $37,000,000 to Reese's corporation, Louis Reese, Inc. with the DeSoto property as collateral.

As a condition of the loan, Reese agreed to acquire or cause someone else to acquire two of the REO properties, the "Witte" and "Ponderosa" properties, which were classified as non-performing

---

[1] The "loan to-one-borrower" limitation rule restricts the amount of money which a financial institution can lend to any single borrower.

assets on Lamar's books.  The down payment for these properties was funded by Lamar lending excess money with respect to the DeSoto property and the borrower, Louis Reese, Inc., would pass the funds on to the nominee purchaser.  The DeSoto property was thus used to generate money which would be used to purchase the Witte and Ponderosa properties from Lamar.  Proceeds from the DeSoto loan were $14,634,663 in excess of the purchase price needed to purchase the DeSoto property.  Approximately $11,000,000 of the excess funds were used to facilitate the purchase of the Witte and the Ponderosa properties.  These sham transactions created false entries and artificially inflated Lamar's net worth, resulting in deception of the FHLBB.

Because the aggregate of the $37,000,000 loan and the loans for the balance of the sales price of the REO properties would have exceeded Lamar's legal lending limits to any one borrower, Reese gave a business acquaintance, Robert Brown, all of the stock of Berkshire Realty, Inc. (Berkshire), a shelf corporation[2] owned by Reese and arranged for Berkshire, to purchase the Witte and Ponderosa properties as a nominee for Reese.  Brown and Berkshire were thereby used in the loan transaction to circumvent the "loan-to-one-borrower" limitation.

The entire transaction proved to be unsuccessful, and Lamar eventually foreclosed on the Witte and Ponderosa properties and took back the DeSoto property in settlement of the loan.  Reese

_____

[2] A shelf corporation is a corporation formed for future purposes and left on the shelf until that purpose come to pass or another purpose is selected.

4

agreed to forego any litigation against Lamar for its alleged breaches of promises to Reese.

Lamar was able to later sell the two REO properties for a profit of $1,626,857. However, the DeSoto property which was deeded back to Lamar in August 1986 was appraised in October, 1986 for $13,000,000. Lamar was subsequently taken over by the Federal Deposit Insurance Corporation (FDIC).

B. The IRS Case

In 1984, two individuals, identified as "A" and "B" approached Reese and proposed a real estate transaction.

Individual "A" had advanced $2,300,000 toward the purchase of a horse farm in Kentucky and wanted to use Reese's equity in a parcel of land, LBJ/Central property, located in Dallas, Texas, to fund the remainder of the purchase price. Reese, Individual "A" and a third party, Individual "B" agreed to form Slew Farms, Inc., a Cayman Island partnership, to control the property. Individual "A" also formed Haft, Inc. in Nevada. Haft, Inc. was wholly owned by Slew Farms.

On October 19, 1984, Reese conveyed the LBJ/Central property to Haft, Inc. for $15,900,000. On the same day, Haft, Inc. sold the same property to a corporation owned by "B" for $28,186,565. Western Savings Association financed the sale with a $29,000,000 loan to "B"'s corporation. Haft, Inc. thus realized a $12,000,000 profit on the sale. "A" then wire transferred the $12,000,000 proceeds from the sale, plus the proceeds from a $2,000,000 loan, through an Allied Bank account in Dallas, Texas, to a Guiness Mahon

5

Cayman Trust Ltd. account in New York City, to an account in the name of Warrenton Farms, Inc. in Fayette Commerce Bank in Lexington, Kentucky. Warrenton Farms, Inc., was wholly owned by Slew Farms, Inc. Individual "A" used the $14,000,000 to buy the Kentucky horse farm. Haft, Inc. never filed a corporate income tax return and did not pay any corporate income taxes.

These transactions were planned in such a manner that the true nature of the deal was not disclosed in the loan documents to Western and the loan documents did not disclose the relationship between the parties to the sale of the LBJ/Central property. Western suffered a $12,100,000 loss as a result of the scheme.

On July 9, 1991, pursuant to a plea agreement, Reese entered a plea of guilty to Count one of the indictment in the Lamar case, Cause No. A-90-CR-117, and to the one-count information in the IRS case, Cause No. A-91-CR-85.

C. The Sentences

The federal probation department concluded in a court-ordered presentence investigative report (PSR) that there was a $9,265,829 loss with respect to the Lamar transaction and that Western lost $12,100,000 as a result of its loan to B's corporation.

On February 19 1992, the trial court held a hearing on restitution. Federal Bureau of Investigation Agent Matt Gravelle, a Certified Public Accountant, testified for the government about the loss created by the DeSoto loan in the Lamar transaction.

6

Agent Gravelle offered two calculations to determine the loss.[3]  In the second computation, the one eventually adopted by the court, the loss was determined by tracing monies expended at the closing of the DeSoto loan that Gravelle considered not related to the acquisition or development of the DeSoto property.  According to Gravelle, out of the $28,717,000 funded at the DeSoto loan closing, $12,274,000 were funds not related to the DeSoto loan.  From that amount, Reese was credited with the $3,700,000 certificate of deposit that Reese ultimately returned to Lamar Savings.[4]  This produced a figure of $8,574,000 to which loan brokerage fees of

---

[3] The first theory Gravelle testified about was as follows:

```
Total disbursed
$28,717,000
DeSoto appraised value
 after return - October 17, 1986
   13,000,000
15,717,000
CD return
  3,700,000
    Loss
$12,017,000
```

---

The second theory calculated the loss as follows:

```
Outside normal scope of DeSoto closing
$12,274,000
CD Return
 3,700,000
8,574,000
+Brokers' payments - Ponderosa
  146,000
8,720,000
+Brokers' payments - Witte
  544,000
```

$ 9,264,000

[4] The $3,700,000 certificate of deposit was purchased by Louis G. Reese, Inc., a Texas corporation, out of the original DeSoto loan funds.  Louis G. Reese, Inc., at the time it deeded the DeSoto property back to Lamar Savings through a deed in lieu of foreclosure, surrendered this certificate of deposit to obtain release of both Louis G. Reese, Inc. and Reese who had guaranteed the debt from personal liability on the original $37,000,000 note.

$129,000 from the Ponderosa loan and $544,000 from the Witte loan were added. The result, the $9,264,000 number, was very similar to the restitution sum submitted by the FDIC and the PSR; and the court adopted that amount.

The district court sentenced Reese in the Lamar case, to three years in prison, $50 special assessment fee and ordered him to pay restitution of $9,265,829 pursuant to 18 U.S.C. § 3579.[5] The court also sentenced Reese in the IRS case to a consecutive two-year term of imprisonment and $50 special assessment fee. No restitution was ordered in the IRS case.

On appeal Reese raises four grounds of relief as follows:

1. Whether the district court erred in requiring Reese to pay restitution for the loss incurred on the Desoto property.

2. Whether the district court erred when it imposed the restitution without considering Reese's inability to pay and the impact of a restitution order upon Reese's dependents.

3. Whether the district court correctly computed the amount of restitution.

4. Whether the district court erred in considering a loss to Western at sentencing when Reese was not charged with the loss.

We AFFIRM in part and VACATE and REMAND in part.

II.

WHETHER THE DISTRICT COURT ERRED IN REQUIRING REESE TO PAY RESTITUTION FOR THE LOSS INCURRED BY THE FORECLOSURE OF THE DESOTO PROPERTY

---

[5] Title 18 U.S.C. § 3579 (1985) under which Reese's restitution was ordered was renumbered as 18 U.S.C. § 3663 (Supp. 1990). This opinion will refer to the restitution provisions under their current designation.

8

Reese's first claim is that the district court erred in imposing restitution for Reese's role in the DeSoto loan transaction because the DeSoto component of the loan was not a criminal transaction.

Reese claims that the Lamar loan transaction consisted of distinct components: the Witte and Ponderosa components which he concedes were illegal and the other component which he claims was not illegal because it simply involved a regular loan secured by real property located in DeSoto, Texas. He contends that because the DeSoto property loan transaction was legal, the restitution imposed applied to the non-criminal component of the conspiracy and, therefore, any loss incurred with respect to it should not be attributed to Reese. 18 U.S.C. § 3663. See, e.g., Hughey v. United States, 110 S. Ct. 1979 (1990); United States v. Paredo, 884 F.2d 1029 (7th Cir. 1989). Reese points out that Lamar actually realized a gain of $1,626,857 with respect to the two distressed properties. Therefore, no restitution is due there either. Reese concludes that Lamar's remedy for its loss is of a civil nature, not a criminal one.

The legality of a restitution order is reviewed de novo, and, if the sentence is legal, the award is reviewed for abuse of discretion. United States v. Chaney, 964 F.2d 437, 451-52 (5th Cir. 1992).

Reese admits that over funded monies in the Lamar loan for the purchase of the DeSoto properties were used to purchase distressed properties owned by Lamar; that this transaction caused false

9

entries in the books and records of Lamar and caused the "net worth" of Lamar to be falsely inflated; that he participated in the criminal conduct associated with the DeSoto loan transaction when he provided a "nominee borrower," Berkshire Realty, Inc. and Robert Brown, to the transaction in an effort to circumvent the "loans-to-one-borrower rule"; that he was aware that Lamar wanted to improve their balance sheet by removing the two pieces of property from their books and avoid a regulatory order and that he knew that the loan on the DeSoto property would not have been made unless he agreed to buy the other property.

The illegal transaction to which Reese pled guilty involved all of the loans relating to three pieces of property. The entire DeSoto loan transaction was criminal. Reese cannot separate one portion of a criminal transaction from the whole transaction. As long as there is any illegal taint to a transaction, the entire transaction is considered illegal. Chaney, 964 F.2d 437.

III.

WHETHER THE DISTRICT COURT ERRED WHEN IT IMPOSED THE RESTITUTION WITHOUT CONSIDERING REESE'S INABILITY TO PAY AND THE IMPACT OF A RESTITUTION ORDER UPON REESE'S DEPENDENTS

Reese next argues that the court erred when it disregarded certain information in the PSR and in its own findings and ordered Reese to pay the $9,265,829 in restitution.

Reese claims that the PSR indicated that he had millions of dollars of civil claims against him and that his only asset of substance was the family homestead, an exempt asset under Texas law. The financial information available to the Court made it

10

clear, moreover, that the impact of any restitution order would affect Reese's family and dependents. Finally, he says that at sentencing the district judge acknowledged that Reese did not have the financial resources to pay the restitution, but that the court ignored that determination and awarded the restitution anyway. He claims that this procedure is directly contrary to the statutory requirements which require a Court to consider a defendant's ability to pay and the impact of the restitution order upon a defendant's dependents and that it was unreasonable and excessive. 18 U.S.C. § 3664 (a). See, e.g., United States v. Peden, 872 F.2d 1303 (7th Cir. 1989); United States v. Bruchey, 810 F.2d 456 (4th Cir. 1987). United States v. Mahoney, 859 F.2d 47 (7th Cir. 1988). United States v. Pollack, 844 F.2d 145 (3rd Cir. 1988). He says that the Court retains discretion under the Victim and Witness Protection Act to refuse restitution in an appropriate case. 18 U.S.C. § 3664, See, e.g., United States v. Owens, 901 F.2d 1457, 1458-9 (8th Cir. 1990).

An order of restitution will be reversed on appeal only when the defendant shows that it is probable that the court failed to consider a mandatory factor and the failure to consider the mandatory factor influenced the court. United States v. Gomer, 764 F.2d 1221, 1223 (7th Cir. 1985). The Court's failure to follow the statutory requirements is reviewed for abuse of discretion. United States v. Barndt, 913 F.2d 201 (5th Cir. 1991).

Reese's claim that the district court made a specific finding of Reese's inability to pay restitution is based on the court's

11

remarks at the completion of the sentencing in which it responded to the government's request that Reese be required to pay restitution in some method other than installment payments. The Court stated:

> I didn't say anything about that. As far as I am concerned, he can pay the $9,000,000 today, if he wants to or has the ability to pay. I'm sure he's not going to do that or doesn't have the ability. But that's part of this judgment.

Reese interprets this comment to be a finding by the court that Reese was unable to pay the restitution at all. We do not understand the judge's comment as such, but rather interpret it as merely a refusal by the judge to venture a guess as to whether or not Reese could pay the full restitution amount on the day of sentencing. The judge made it clear by his statement that he had ordered no set method of payment of the restitution to be made by Reese, but that the payment should be paid within the statutory time limits.

Title 18 U.S.C. § 3664(a) mandates that the district court consider "[t]he amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate." But 18 U.S.C. § 3664 (d) imposes on the defendant the burden of demonstrating he lacks the financial resources to comply with a restitution order. See United States v. Rochester, 898 F.2d 971, 981-82 (5th Cir. 1990).

12

Reese never raised the issue of inability to pay in any of his objections to the PSR nor did he demonstrate to the court his financial inability to comply with a restitution order. No specific finding was requested of the court by Reese as to his inability to pay. Even after the court imposed the restitution order on Reese, Reese did not object to the order based on Reese's inability to pay. Reese has failed to carry his burden of proving an inability to pay restitution. We are satisfied that the district court did not fail to take into consideration the necessary elements in assessing restitution.

IV.

ASSUMING RESTITUTION IS PROPER, WHETHER THE DISTRICT COURT
CORRECTLY COMPUTED THE AMOUNT OF RESTITUTION

Reese next argues that the district court erred because it did not correctly compute the amount of that restitution.

At the restitution hearing, Reese submitted the testimony of his own expert witness, an appraiser named Harry Schroeder who appraised the undeveloped value of the DeSoto property in May of 1985 at $37,000,000 and the "as developed" value at $45,000,000. Schroeder concluded that, based upon comparable land sales in August 1986 (but subject to the fact that he had not done a complete appraisal), that a conservative value of the 225 acre piece of property would be in excess of $2 per square foot (approximately $19,600,000).

Schroeder testified that the government appraisal was incorrectly based upon "fair value", a fictitious figure which discounted the value of the property based upon the assumption that

13

the property would not be resold for three to four years as opposed to "fair market value," an estimate of the price that a buyer would pay in an arm's length transaction in August of 1986. Schroeder also suggested that the government's appraisal included comparables that were 1985 sales of much smaller tracts and thus would potentially affect the validity of the appraisal made.

Schroeder noted that Lamar made a profit on the Witte and Ponderosa properties of almost $2,000,000, and that Lamar suffered no loss on the DeSoto transaction because when Lamar foreclosed upon the DeSoto property it was worth at least the amount that Lamar had lent.

The Court nevertheless rejected Schroeder's opinion and Reese's testimony, found Agent Gravelle's estimate of the restitution amount of $9,265,829 to be credible testimony, and adopted the government's computation of loss.

Reese submits three reasons as to how the court incorrectly computed the restitution amount:

1. The District Court valued the DeSoto property based upon an appraisal dated several months after the date the property was surrendered to the financial institution;

2. The government's appraisal used "fair value"; and

3. The District Court excluded the $6,500,000 payment that was made to Lamar at closing for the down payment on the REO properties.

There is no error in connection with the first two reasons submitted by Reese. However, we find the failure of the judge to

14

give credit for the amount of the down payment on the REO property to be clearly erroneous.

The standard of review on appeal for a court's restitution order is whether the district court abused its discretion in directing the restitution. United States v. Paden, 908 F.2d 1229, 1237 (5th Cir. 1990). District Courts are accorded broad discretion in ordering restitution. Id. at 1237. The burden of proof for establishing restitution is upon the government by a preponderance of the evidence. 18 U.S.C. § 3664(d). The court, in determining the appropriate amount of restitution, may consider affidavits and letters by the injured party. See, United States v. Rochester, 898 F.2d 971 at 982; United States v. Hairston, 888 F.2d 1349, 1354 (11th Cir. 1989); and may consider other hearsay evidence that bears minimal indicia of reliability so long as the defendant is given an opportunity to refute that evidence. United States v. Rodriquez, 765 F.2d 1546, 1555 (11th Cir. 1985). If the restitution was computed in violation of statute, it is illegal, and the correct standard of review is de novo. Otherwise an order of restitution will be reversed on appeal only when the defendant shows that it is probable that the court failed to consider one of the  mandatory factor and the failure to consider the factor influenced the court. United States V. Gomer, 764 F.2d 1221, 1223 (7th Cir. 1986); United States v. St. Gelais, 952 F.2d 90 (5th Cir. 1992).

Restitution in property crime cases is governed by  18 U.S.C. § 3663(b) which provides:

15

The order may require that such defendant--

(1)  in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense--

(A)  return the property to the owner of the property or someone designated by the owner; or

(B)  if return of the property under subparagraph (A) is impossible, impractical, or inadequate, pay an amount equal to the greater of--

(i)  the value of the property on the date of the damage, loss, or destruction, or

(ii)  the value of the property on the date of sentencing,

less the value (as of the date the property is returned) of any part of the property that is returned; . . . .

The cases have made clear that the measure defined in this statute is exclusive.  See United States v. Keith, 754 F.2d 1388 (9th Cir. 1985); United States v. Husky, 924 F.2d 223 (11th Cir. 1991); United States v. Mitchell, 876 F.2d 1178 (5th Cir. 1989). Under subparagraph (A) of this statute, a return of the property to the owner is the first measure of restitution.  Looking first at the Witte and Ponderosa aspects of the transactions, we assume the "property" is land and improvements so labelled which were transferred by Lamar to the fictional purchasers as a result of the fraudulent scheme devised by the defendants.  While the record is not clear, it appears that these properties were ultimately returned to Lamar, probably as a result of foreclosure.  The trial court in its statement of findings about restitution indicated that it would consider "gain" realized on the Witte and Ponderosa properties by Lamar after return of the properties.  We see nothing

in the statutory provision which would give a defendant credit for the gain on resale realized by the victim after return of the property to the victim. Of course the trial judge didn't really award the $10,390,000 that he found to be the amount of restitution owed, but rather simply adopted the claim of $9,265,829 which was described in the letter from the FDIC and in the PSR.

Subparagraph (B) of the cited statutory provision indicates that "if return of the property under subparagraph (A) is impossible, impractical, or inadequate" the court may require the defendant to pay as restitution, a dollar amount defined therein. The application of subpart (B) is conditioned upon a finding that return of the property under subparagraph (A) is "impossible, impractical, or inadequate"; and there is no such finding in the record.

As to the Desoto property loan side of the transaction, it would appear that the "property" as to which Lamar might have suffered "damage to or loss or destruction of" could only be loan proceeds funded in cash at the original closing of this loan. Lamar's interest in the Desoto property, (i.e. the land and contemplated improvements) was never anything except a lien holder; and we doubt that such a security interest would qualify as "property of the victim." The trial court found that the money funded at closing was $28,717, 448 which Lamar advanced against a promissory note of $37,000,000. If the "property" is the cash funds advanced at closing, then to determine whether there has been "damage to or loss or destruction of" such property, you would have

17

to first determine what cash, if any, came back to Lamar as part of the closing itself. Typically, lenders require a borrower to pay them points for making the loan, various fees and charges in the nature of expenses incurred by the lender and, in some cases, prepaid interest, all of which would normally be deducted out of initial loan proceeds as reflected on the closing statement regarding the loan transaction. Likewise, in this case, it appears from the evidence that the funds advanced at closing on the Desoto loan included funds which Louis Reese, Inc., the borrower, passed on to the nominal purchaser Berkshire/Brown under the fictional purchase transaction, and those funds were used in the closing of the separate purchase transaction to pay the cash down payment due to Lamar for the sale of the Witte and Ponderosa properties. Apparently, these closings were all done simultaneously at the same title company, and there was no way that the cash proceeds advanced to Reese, so it could advance them to Berkshire/Brown, could have ever been used by Reese for any other purpose. Therefore, at the end of the closings, the cash down payment, due to Lamar as seller, less any closing expenses which Lamar would normally incur as seller (i.e. owner's title insurance, prorated taxes, surveys, etc.), would have come back to Lamar as a net reduction in the total amount of cash advanced on the Desoto loan. Obviously, these funds would not have come back to Lamar as a payment against the amount which Reese, Inc. owed on its promissory note; but for purposes of restitution, it seems only fair that the "cash" which Lamar advanced as part of this illegal loan transaction, should be

18

reduced by those sums which came back to Lamar in "cash" as part of the closing of the illegal loan. Neither the government's expert witness nor the court ultimately recognized these reductions in the amount of "cash" which was actually put at risk by the illegal loan transaction.

The trial judge says there was no obligation to give a credit for the cash down payment on Witte and Ponderosa because to do so would simply change the gain of $1,600,000 on the Witte and Ponderosa property to a loss of $4,400,000. But, neither the amount claimed by the FDIC in its letter nor the amount stated in the PSR gave any recognition to the $1,600,000 gain on Witte and Ponderosa; and since, in spite of the trial court's own finding, the trial court ultimately adopted the $9,265,000 figure as the amount of restitution, the reason cited for not considering the cash down payment is moot as far as the actual figure ultimately awarded by the trial judge. In any event, as we said earlier, the Witte and Ponderosa properties were returned "in kind" to Lamar; and there is no evidence in the record that these properties were damaged while owned by the fictitious buyer, nor is there any testimony that these properties were less valuable when returned to Lamar than they were when conveyed out by Lamar at the original closing.

Now, analysis of the testimony of the government's expert about the $9,265,000 amount, indicates that it starts with a figure of $12,274,000 which was labelled "payments outside the normal scope of the Desoto closing." On cross examination, he itemized

19

the various amounts which went in to this $12,000,000 dollar figure. There is no testimony which explains what criteria this "expert" used in determining what constituted "payments outside the normal scope of the DeSoto closing." Furthermore, there is nothing in the statute that would call for a determination of what was "outside the normal scope of the Desoto closing." If that loan is illegal because in effect it was made in violation of the "loans to one borrower" limit, then it seems to us that the whole of the loan proceeds which may be lost as a result of the offense, would be at risk and not just some portion categorized by the expert as being "outside the normal scope of a closing."

Looking now at the credits given by the government's expert in determination of restitution amounts for the $3,700,000 involved in the letter of credit and the $13,000,000 which was the appraised value of the Desoto property after it was returned to Lamar by deed in lieu of foreclosure, we have little doubt that the surrender of a letter of credit to the issuer is close enough in legal contemplation to the payment of cash to Lamar that it should constitute at least a partial "return" of the "cash proceeds advanced at loan closing." We are puzzled why under one theory the government expert gave credit for the $13,000,000 appraised value of the Desoto property, but did not under his other theory, which is the one closest to the amount actually adopted by the trial court. Conceptually, it would seem to us that when a lender accepts conveyance of the secured property in lieu of foreclosure, the value of such property should constitute a partial return of

20

the "cash loan proceeds." We have no problem with the trial court accepting the appraised value of the DeSoto property, as indicated by the appraisal done two months after the deed in lieu of foreclosure, rather than the appraisal testimony offered by the defendants at the restitution hearing. That is a credibility call, and the trial judge is in the best position to make that decision.

As to the amount of restitution ordered by the trial judge, we conclude:

a. The theory for calculation of restitution in the amount of $9,265,000, testified to by the government expert, and as claimed by the FDIC and reported in the PSR, finds no support in the statutory definition;

b. The first theory used by the government expert, and the findings described by the trial judge, started out on the right track (i.e. the property is the "cash proceeds advanced at closing,") but fail to take into consideration payments which returned to Lamar as a result of the closing, and, therefore, reduced the quantum of the cash proceeds which were actually at risk. Those reduction items would include points paid back to the lender, reimbursement of various lender expenses, prepaid interest, and the net cash returned to Lamar from the sale of the Witte and Ponderosa properties after reduction of normal expenses that Lamar incurred as seller in those sales transactions. Likewise, the appraised value of the DeSoto property when deeded to Lamar constitutes a partial return of the property as does the letter of credit which was surrendered.

21

c.   The testimony and evidence in the restitution hearing is inadequate to permit the appellate court to arrive at a correct determination of these amounts; and

d.   We VACATE the portion of the sentence related to restitution, and REMAND the issue of restitution  for a further hearing in accordance with the provisions hereof.

V.

WHETHER THE DISTRICT COURT ERRED IN CONSIDERING A LOSS TO WESTERN AT SENTENCING WHEN REESE WAS NOT CHARGED WITH A LOSS

In addition to the illegal transaction above, Reese pleaded guilty to a conspiracy to defraud the IRS when he participated in a real estate transaction that was structured in a complicated fashion to conceal the gain from that transaction from the IRS.  At sentencing, the trial court imposed no restitution penalties for the financial loss to the financial institution involved in the conspiracy and no loss was due on the IRS charge because no determination was ever made as to the amount of the tax loss by the IRS.  Reese's PSR nevertheless contained a statement that Western lost $12,100,000 when Western financed some portion of the real estate transaction that enabled Reese and his co-conspirators to defraud the IRS.

At his sentencing hearing, Reese objected to the inclusion in his PSR of the loss to Western because he says that he pleaded guilty to a scheme to defraud the IRS, but did not plead guilty to fraud with respect to a financial institution.  Therefore, he complains his PSR should not have stated that Western lost $12,100,000 on the loan.  Reese states that he objected to the

22

foregoing statement on the ground that the loss suffered by Western had nothing to do with the crime; that the government did not explain how the $12,100,000 loss was computed; and that the government did not demonstrate that the loss resulted from criminal conduct.

Reese wants the loss suffered by Western removed from the PSR because he claims that the figure is incorrect and prejudicial in that it would potentially affect his sentence and jeopardize his treatment by the United States Bureau of Prisons and the United States Parole Commission.

Reese argues that his objections to alleged factual inaccuracies in the PSR triggered Rule 32(c)(3)(D), but that the court failed to comply with the Rule by not making a finding as to these inaccuracies. United States v. Aubrey, 878 F.2d 825 (5th Cir. 1989).

Rule 32(c)(3)(D) provides as follows: [6]

> If the comments of the defendant and the defendant's counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence investigation report or the summary of the report or part thereof, the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing. A written record of such findings and determinations shall be appended to and accompany any copy of the presentence investigation report thereafter made available to the Bureau of Prisons or the Parole Commission.

---

[6] This Rule is applicable to offenses, like Reese's, committed prior to November 1, 1987.

Where a challenge is raised by the defendant regarding the factual accuracy of the PSR, the judge must either make a finding as to each objection or state that a finding is unnecessary because he is disregarding the controverted information in making the sentencing decision. United States v. Piazza, 959 F.2d 33, 36 (5th Cir. 1992); United States v. Lawal, 810 F.2d 491, 492 (5th Cir. 1987). However, the finding need not be in any particular form, as long as this Court is able to determine from the record whether the district court found the challenged fact in favor of or against the defendant and whether the fact affected the sentence. United States v. Puma, 937 F.2d 151, 155-56 (5th Cir. 1991), cert. denied, ___U.S.___, 112 S. Ct. 1165 (1992); United States v. Perrera, 842 F.2d 73, 75-76 (4th Cir.), cert. denied, 488 U.S. 837 (1988).

The government argues that Reese's arguments fail for several reasons. Upon review we agree.

Reese argues that the facts found in the PSR do not establish that any loss to Western was relevant to the conspiracy charge or that the loss was the result of criminal conduct. In objecting to the Western loss statement in the PSR, Reese claims that he was not personally involved in obtaining the loan which resulted in the loss. But the PSR does not allege that Reese was personally involved in obtaining the loan. It simply alleges the transaction as part of the conspiracy.

The record reflect that the loan obtained from Western was an integral part of the conspiracy. The loss to Western was the

24

result of criminal conduct by which income was obtained and concealed.

"[O]nly historical, objectively verifiable information reported in the PSI, antedating the report and existing independent of it, can properly be contested as a `fact' under Rule 32." United States v. Jones, 856 F/2d 146, 150 (11th Cir. 1988).

Reese fails to allege any such "factual inaccuracies" in his PSR which would trigger Rule 32(c)(3)(D). But rather his objections go "merely to tone, form, or style of the report." He attacks only the district court's application of the report's legal conclusion, based on the facts therein. He does not deny that the information was accurate, only that it was not properly admissible. Reese therefore failed to make the requisite showing that the information in the PSI report was "materially untrue." United States v. Flores, 875 F.2d 1110, 1113 (5th Cir. 1989), Piazza, at 37. United States v. Aleman, 832 F.2d 142, 145 (11th Cir. 1987; United States v. Cox, 934 F.2d 1114, 1126 (10th Cir. 1991). United States v. Hand, 913 F.2d 854, 857 (10th Cir. 1990); United States v. Pellerito, 918 F.2d 999, 1002-003 (1st Cir. 1990).

Moreover, there is evidence that the court did comply with its duty to make a finding as to the alleged factual inaccuracies and with Rule 32(c)(3)(D). When Reese objected that the loss to Western should not have been included in the PSR because Reese was not responsible for that loss, the court requested a response thereto from the government. The probation officer explained that Reese was responsible because he was a member of the conspiracy and

25

that the amount of the loss, $12,100,000, had been confirmed by the United States Attorney's office in Dallas. The trial court overruled Reese's objection. It thereby resolved the disputed facts against him and accepted the findings of the PSR that the conspiracy resulted in a $12,100,000 loss to Western. See, United States v. Puma, 937 F.2d at 155-56. The court attached a written record of its findings, an addendum entitled "Controverted Presentence Matters" to the PSR which indicates that Reese's objections "re: 12,100,000" were overruled by the trial court. Puma, at 155-56.

The District Court's decision to overrule Reese's objection was correct. Reese admitted that he was a member of the conspiracy and that it was the intent of the co-conspirators to impede the IRS from determining the correct taxable income of the real estate transaction and that the transactions were intentionally structured to conceal their true nature from Western. Because the loan from Western was an integral part of the conspiracy, Reese was responsible for the actions of his co-conspirators. Pinkerton v. United States, 328 U.S. 640 (1946); Chaney, 964 F.2d 437; United States v. Acosta, 763 F.2d 671, 681 (5th Cir.), cert. denied, 474 U.S. 863 (1985).

Finally, we do not believe that Reese was deprived of any information as to the number and the accuracy of the loss to Western. The record reflects that the court did consider the accuracy of the $12,100,00 figure set forth in the PSR as the loss to Western when the Probation Officer informed the trial court that

this figure was verified by the United States Attorney's office. The basis of the $12,100,000 figure is evident from the face of the PSR.

VI.

CONCLUSION

We AFFIRM the district court's judgment as to all allegations of error asserted by Reese except the determination of the amount of restitution; and find that the trial court did not correctly compute the amount of restitution. We, therefore, VACATE the portion of the district court's judgment as to the amount of restitution and REMAND that portion to the district court for redetermination.