# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

No. 96-40115

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BEN D. CAMPBELL,

Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Texas

February 7, 1997
Before GARWOOD, DAVIS and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Ben D. Campbell appeals what he calls a "vindictive" sentence imposed by the district court. He was convicted of making a false entry in bank records ("Count I"), conspiracy to commit bank fraud ("Count II"), and bank fraud ("Count III"). The district court sentenced Campbell to five years' probation on Count I and fifty-one months' imprisonment on Counts II and III, the sentences to run concurrently. The court also ordered restitution in the amount of $540,229.56.

In United States v. Campbell, 64 F.3d 967, 978 (5th Cir. 1995), we reversed Campbell's convictions on Counts II and III because of insufficient evidence and remanded the case for

resentencing without further instructions. On remand, the district court overruled all of Campbell's objections to the imposition of a greater sentence than probation, and sentenced Campbell to forty months' imprisonment on Count I and ordered him to pay restitution in the amount of $211,082.18. Campbell timely filed his notice of appeal. For the following reasons, we AFFIRM Campbell's sentence and REVERSE and VACATE the restitution order.

## BACKGROUND[1]

In 1978, John Campbell ("John") purchased 6.2 acres of land near Crested Butte, Colorado ("Crested Butte") for development as a resort. In 1984, Campbell, his father John, and Daniel Thurman formed West-Butte Corporation ("West-Butte") to continue with development of the Crested Butte property. West-Butte's Articles of Incorporation listed Thurman as president, Campbell as vice-president, and Shirley Thurman as secretary/treasurer. The corporation's sole asset was the Crested Butte property, which John had conveyed to West-Butte by warranty deed.

In 1986, Campbell began experiencing financial difficulties with other companies he owned. In an effort to solve his debt problems, Campbell approached Mbank Fort Worth for a loan, and offered to pledge the Crested-Butte property as collateral. Mbank refused to approve the loan when it discovered that West-Butte, not Campbell, owned Crested Butte and that there was a defect in the warranty deed that conveyed it from John to West-Butte. Undeterred, Campbell then turned to Flower Mound Bank ("FMB") for the loan, a bank which already had eleven other unsecured notes executed by Campbell on prior occasions. Viewing his prior unsecured notes as a potential pitfall, Campbell offered to pledge the property as collateral both for his new loan and as security on his

---

[1]As this case is on appeal for the second time, we do not recite all the facts that were adduced at the initial trial. A more detailed statement of the facts can be found in United States v. Campbell, 64 F.3d 967 (5th Cir. 1995).

2

existing loans. FMB, as did Mbank, noticed the defect in the deed and that Campbell did not own Crested Butte, but nevertheless agreed to lend Campbell $90,000 if he could cure the defect and obtain a corporate resolution from West-Butte, granting Campbell the authority to encumber it. Although no corporate resolution was obtained, Campbell managed to remedy the defect in the deed, which apparently was enough for FMB, as it eventually approved the loan. Campbell executed the mortgage in favor of FMB, signing the mortgage on behalf of West-Butte as its president. Crested Butte was collateral for all twelve of Campbell's loans, including the most recent $90,000 loan.

In 1987, Campbell filed for bankruptcy. Security Bank of Flower Mound ("Security Bank"), which had acquired all of FMB's assets when it became insolvent, made a demand on Campbell for the amount of the defaulted promissory notes secured by the mortgage on Crested Butte. Eventually, Security Bank filed suit in Colorado state court. West-Butte initially fought to keep the property, but after negotiations with Security Bank, the parties agreed upon and signed a settlement. The Crested Butte property was then sold for $320,000, with Security bank receiving $123,917.82. Based on the actions taken by Campbell, he was indicted on the charges of conspiracy to commit bank fraud, on the substantive offense of bank fraud, and on the charge of making a false entry in bank records with intent to deceive because of his false signature as president of West-Butte on the mortgage to FMB.

**PROCEDURAL HISTORY**

Ben Campbell ("Campbell") was convicted of making a false entry in bank records, 18 U.S.C. § 1005 ("Count I"), conspiracy to commit bank fraud, 18 U.S.C. § 371 ("Count II"), and bank fraud, 18 U.S.C. § 1344 ("Count III"). The district court sentenced Campbell to five years' probation on Count I and 51 months' imprisonment on Counts II and III, the sentence to run concurrently. The court ordered restitution in the amount of $540, 229.56. On appeal, we reversed Campbell's

3

convictions on Counts II and III because of insufficient evidence and remanded the case for resentencing without further instructions. There was no challenge to the sentence in the first appeal.

On remand, Campbell objected to the imposition of any sentence greater than the five years' probation that he had originally received on Count I on the grounds that a longer sentence would violate the rule against vindictive resentencing established in North Carolina v. Pearce, 395 U.S. 711 (1969). Campbell also objected to any sentence requiring restitution because he alleged there were no losses resulting from the offense of conviction. The district court overruled all of Campbell's objections and sentenced him to forty months' imprisonment on Count I and ordered him to pay restitution in the amount of $211,082.18. This appeal followed.

## STANDARDS OF REVIEW

We review the question of whether a sentence is vindictive, and thus unconstitutional, de novo. However, a district court retains wide discretion in sentencing, and the sentencing decision is entitled to considerable deference. Wasman v. United States, 468 U.S. 559, 563 (1984). We review the legality of a court's order of restitution de novo, and if the sentence is legal, the award is reviewed for abuse of discretion. United States v. Jimenez, 77 F.3d 95, 99 (5th Cir. 1996); United States v. Reese, 998 F.2d 1275, 1280 (5th Cir. 1993).

## DISCUSSION

In this appeal, we are faced with two questions: (1) whether the sentence imposed by the district court on remand was violative of Pearce, as a vindictive sentence, and (2) whether the district court erred by ordering Campbell to pay restitution. We affirm the district court's sentencing decision and hold that Campbell's sentence on remand was not vindictive in violation of North Carolina v.

4

Pearce, 395 U.S. 711 (1969), overruled on other grounds, Alabama v. Smith, 490 U.S. 794 (1989). However, we reverse and vacate the district court's restitution order.

## I.      VINDICTIVE RESENTENCING

### A.      The Supreme Court's Decision in Pearce

In the seminal Pearce decision, the Supreme Court set out guidelines regarding vindictive sentencing occurring after a defendant successfully appeals a conviction (or convictions).  The Court held that

> due process of law, then, requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial. And since the fear of such vindictiveness may unconstitutionally deter a defendant's exercise of the right to appeal or collaterally attack his first conviction, due process also requires that a defendant be freed of apprehension of such a retaliatory motivation on the part of the sentencing judge.

Pearce, 395 U.S. at 725. Further, "whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for doing so must affirmatively appear." Id. at 726. This rule has since been read to "[apply] a presumption of vindictiveness, which may be overcome only by objective information in the record justifying the increased sentence." Wasman, 468 U.S. at 565. Although Pearce was addressing the situation where a harsher sentence was imposed on retrial, we have said that Pearce should not be so narrowly read to preclude its application to a resentence on remand. United States v. Vontsteen, 950 F.2d 1086, 1089 (5th Cir. 1992).

It is clear to us that the presumption of vindictiveness in Pearce is designed to prevent miscarriages of justice by a sentencing judge who exacts revenge on a defendant who succeeds on appeal. The rule is a prophylactic one, addressed more to protect future litigants who appeal than to the injustice done in the actual case. Tolerance of a court's vindictiveness might "chill" a defendant's

5

right to seek an appeal of her sentence. <u>Wasman</u>, 468 U.S. at 564. Such a situation contravenes basic constitutional principles founded in the Due Process Clause of the Fifth and Fourteenth Amendments. <u>Id.</u> A sentencing court, however, must have the discretion to fashion a sentence commensurate with the crime(s) for which the defendant is convicted. <u>Id.</u> at 563. Hence, <u>Pearce</u> is not implicated in every case in which a sentence imposed after a successful appeal is harsher than the original sentence. <u>Texas v. McCullough</u>, 475 U.S. 134, 138 (1986). Moreover, "when, as in the instant case, the effect of an appellant's challenge implicates the sentencing scheme with respect to interrelated or intertwining counts, the presumption of vindictiveness does not arise if the overall sentence is not increased." <u>United States v. Schoenhoff</u>, 919 F.2d 936, 939 (5th Cir. 1990) (citing <u>United States v. Forester</u>, 874 F.2d 983, 984 (5th Cir.), <u>cert.</u> <u>denied</u>, 493 U.S. 920 (1989)).

        B.        <u>Post-Pearce</u> Confusion—The "Aggregate Package" Approach versus the "Remainder Aggregate" Approach

The precise standard for measuring whether a sentence is so harsh that it triggers <u>Pearce</u> has been the subject of some confusion in this Circuit and among our sister circuits. We have recognized that our <u>Pearce</u> cases have been somewhat "muddled."[2] At the same time, our sister circuits have

---

[2]We said in <u>Vontsteen</u> that

[t]he en banc court in <u>United States v. Henry</u> suggested in dicta that <u>Pearce</u> is implicated when a defendant's sentence is increased on even a single count of a multi count conviction at resentencing. 709 F.2d 298, 315, 323 (5th Cir. 1983). The panel in <u>United States v. Cataldo</u>, 832 F.2d 869, 875 (5th Cir. 1987), questioned the <u>Henry</u> dicta, but this statement by the <u>Cataldo</u> court was itself dicta. In contrast, the panel in <u>Paul v. United States</u>, 734 F.2d 1064, 1067 n. 3 (5th Cir. 1984), in dicta yet again, advocated the <u>Henry</u> approach, without citing <u>Henry</u>. In <u>United States v. Forester</u>, 874 F.2d 983, 984 (5th Cir.), <u>cert.</u> <u>denied</u>, 493 United States 920 (1989), the court seemed to endorse the total aggregate approach; this is subject to some doubt, however, because the panel reviewed the claimed <u>Pearce</u> error under a plain error standard.

<u>Vontsteen</u>, 950 F.2d at 1093. <u>Vontsteen</u> reviewed the alleged <u>Pearce</u> violation for plain error. The

6

endorsed two different methodologies for analyzing a Pearce claim. The majority of circuits have applied the "aggregate package" approach. See United States v. Pimienta-Redondo, 874 F.2d 9, 15 (1st Cir.) (en banc) (plurality), cert. denied, 493 U.S. 890 (1989); Kelly v. Neubert, 898 F.2d 15, 16 (3d Cir. 1990); United States v. Gray, 852 F.2d 136, 138 (4th Cir. 1988); United States v. Mancari, 914 F.2d 1014, 1021-22 (7th Cir. 1990); United States v. Bay, 820 F.2d 1511, 1513 (9th Cir. 1987); United States v. Sullivan, 967 F.2d 370, 374 (10th Cir. 1992). Under this approach, courts compare the total original sentence to the total sentence after resentencing. If the new sentence is greater than the original sentence, the new sentence is considered more severe.

The Second and Eleventh Circuits, however, have endorsed a different Pearce methodology. These circuits apply the "remainder aggregate" or "count-by-count" approach. See United States v. Monaco, 702 F.2d 860, 885 (11th Cir. 1983); United States v. Markus, 603 F.2d 409, 413 (2d Cir. 1979). Using this approach, appellate courts compare the district court's aggregate sentence on the nonreversed counts after appeal with the original sentence imposed on those same counts before appeal. If the new sentence on the remaining counts exceeds the original sentence on those counts, the Pearce presumption attaches.

This case provides a ripe opportunity for us to clarify our methodology in this area. After careful consideration of the two positions endorsed by other circuits, we adopt the majority "aggregate approach" as the rule in this Circuit. We choose the majority rule for two reasons.

_____

court noted that "our own circuit's jurisprudence on the subject is, admittedly, a bit muddled," but found it "unnecessary to resolve the conflict in methodologies" because it was reviewing for plain error due to Vontsteen's failure to make a contemporaneous objection at his resentencing hearing. Id. at 1089.

First, cases in our Circuit have, although not explicitly, endorsed the aggregate approach to determining whether the Pearce presumption of vindictiveness arises. See, e.g., Schoenhoff, 919 F.2d at 939; Forester, 874 F.2d at 984; Cataldo, 832 F.2d at 875. Because our cases are aligned in the direction of the aggregate approach, we see no reason to reverse the trend. Second, and perhaps most importantly, the aggregate approach best reflects the realities faced by district court judges who sentence a defendant on related counts of an indictment. Sentencing is a fact-sensitive exercise that requires district court judges to consider a wide array of factors when putting together a "sentencing package." When an appellate court subsequently reverses a conviction (or convictions) that was part of the original sentence, the district court's job on remand is to reconsider the entirety of the (now-changed) circumstances and fashion a sentence that fits the crime and the criminal.[3] See Pimienta-Redondo, 874 F.2d at 15. The aggregate approach's inherent flexibility best comports with this important goal.[4]

Having chosen the aggregate approach, we now evaluate Campbell's claim that his sentence

[3]The district court's reasoning on remand is consistent with our observations. Specifically, Judge Brown noted:

> Now, in imposing your sentence, I want to state for the record that when I sentenced you originally, I had an obligation to sentence you on three counts, and I took all three of those counts into consideration and came up with what might be termed a package of sentencing on the three counts together. Had I sentenced you on count 1 alone at that time, I would not have given you five years of probation. I would have given you a sentence, I believe, commensurate with the sentence I have given you today. And I want to explain that on the record as to -- as to why I am imposing this sentence.

Appellants Record Excerpts, tab 9 at 19. (Emphasis added).

[4]We leave to another day the situation where the counts are not related, or where it otherwise appears that the package approach was not utilized at the initial sentencing, or where the district court does not give an explanation for its resentencing which is nonvindictive and not plainly unreasonable in light of the record as a whole. None of these factors are present here.

was vindictive to determine whether the Pearce presumption of vindictiveness attaches. We hold that it does not. Campbell was originally sentenced to fifty-one months' imprisonment. On remand, he was sentenced to forty months' imprisonment. The sentence on remand was plainly less severe than the original sentence, and therefore under the aggregate approach we have adopted today, the Pearce presumption does not arise. Campbell's sentence is thereby affirmed.

## II. RESTITUTION ORDER

As we have stated, we review the legality of a restitution order de novo. Jimenez, 77 F.3d at 99. Campbell argues that the district court erred when it determined that the "loss" suffered by FMB totaled $211,082.18[5] and ordered him to pay FMB restitution in that amount. We agree.

We need to go no further than Hughey v. United States, 495 U.S. 411 (1990). In Hughey, the Supreme Court interpreted the restitution provision of the Victim and Witness Protection Act (VWPA), 18 U.S.C. § 3663[6] and concluded that restitution for victims can only be awarded for the

---

[5]The court reached this amount by subtracting both the amount FMB received from the proceeds from the sale of Crested Butte—$123,917.82—and $15,000 as estimated fees that it would have cost FMB to recover the property through foreclosure from the overall value of the property ($350,000).

[6]Section 3663 (b) provides:

The order may require that such defendant--
(1) in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense--
(A) return the property to the owner of the property or someone designated by the owner; or
(B) if return of the property under subparagraph (A) is impossible, impractical, or inadequate, pay an amount equal to the greater of--
(I) the value of the property on the date of the damage, loss, or destruction, or
(ii) the value of the property on the date of sentencing,
less the value (as of the date the property is returned) of any part of the property that is returned; . . . .

9

loss caused by the specific offense that is the basis of the conviction.

The district court ordered restitution pursuant to the VWPA.[7] The district court determined that the loss suffered by FMB was the value of the encumbered property for which FMB loaned Campbell $90,000. The property, Crested Butte, was said to be worth $350,000, and based on this appraisal FMB loaned Campbell $90,000. However, in the instant case, FMB received $123, 917.82 from the sale of Crested Butte, thus, they received $33,917.82 in excess of the amount they loaned Campbell on this property.

The losses attributed to Campbell's false entries—the conduct for which he was convicted under Count I—amounted to the $90,000 he received by using the Crested Butte property as collateral. Moreover, we have previously held that in such a situation—where a piece of property is utilized to procure a loan—the loan amounts to a lien thus the lender is nothing more than a lien holder. Reese, 998 F.2d at 1283. We doubted that such a security interest would qualify as "property of the victim" for purposes of ordering restitution under the VWPA. Id. As such, the FMB was entitled to restitution in the amount of the loss suffered by making a loan to Campbell, i.e., $90,000. See id. (holding that "the 'property' as to which Lamar might have suffered 'damage to or loss or destruction of' could only be the loan funded in cash at the original closing of his loan."). Furthermore, according to § 3663 (b), the loss attributed to the illegal act may be offset by the value of any part of the property that is returned. Because FMB had already received value in excess of the loss attributed to Campbell's false statement, they were not entitled to an award of restitution.

---

[7]Although the district court in this case did not specify whether it relied upon the VWPA or the Federal Probation Act ("FPA") (the applicability of which was made possible because the offense on count I occurred in December 1986, one year prior to the November 1987 repeal of the FPA), the broader provisions of the VWPA are presumed to control. See Chaney v. United States, 964 F.2d 437, 451 (5th Cir. 1992).

The government argues that, because Campbell agreed to attach eleven outstanding loans previously made by FMB to his company, the losses due to Campbell's false entry included the value of the twelve loans. However, notwithstanding the validity of Campbell's agreement with FMB, Hughey precludes such a conclusion. Hughey stands for the proposition that the loss incurred may not exceed the losses directly stemming from the conduct for which the defendant is convicted. We are aware that in Reese, a panel of this Court held that "as long as there is any illegal taint to a transaction, the entire transaction is considered illegal." 998 F.2d at 1280. This conclusion, however, cannot undermine the purpose of the VWPA, which is to put the plaintiff in the same position as if the illegal activity had not occurred.

Finally, we do not read the indictment charging Campbell with making a false entry to mean that his other outstanding loans were also procured by fraud. To the contrary, no evidence was produced that the eleven other outstanding loans had any illegal nature to them. Their only link to anything illegal was Campbell cross collateralizing them to procure the $90,000 loan.[8] There is no evidence that absent Campbell's loan application and mortgage, FMB would have been able to collect on the other outstanding loans.

In sum, FMB suffered no property loss. It was therefore not entitled to restitution. The district court's decision to the contrary is therefore reversed and vacated.

## CONCLUSION

---

[8]The Government asserts that the eleven outstanding loans were "hidden" by Campbell's false statement on the loan application and mortgage thus they became uncollectible because the mortgage on the Butte property was unenforceable. This argument, though, fails to assert how in the absence of the new mortgage, they would not have suffered a loss, in other words, what loss did Campbell's loan cause FMB that they would not have suffered anyway.

11

Having rejected Campbell's claim that his sentence after remand was vindictive, we AFFIRM the district court's sentence. However, finding that the court erred by ordering Campbell to pay restitution, we REVERSE and VACATE the court's restitution order.