IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 93-1182
_____

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

                    versus

JERRY D. HOLLEY and
MARVIN D. HAASS,

                                        Defendants-Appellants.

_____

Appeals from the United States District Court for the
              Northern District of Texas
_____

June 13, 1994

Before GOLDBERG, HIGGINBOTHAM, and EMILIO M. GARZA, Circuit
Judges.

GOLDBERG, Circuit Judge:

        Jerry D. Holley and Marvin D. Haass appeal their criminal

convictions for various crimes committed in the course of the

failure of Peoples Savings and Loan Association ("Peoples").  The

appellants have raised numerous issues, including challenges to the

sufficiency of the evidence, the jury charge, some of the district

court's evidentiary and discovery rulings, and the amount of a

restitution order.  Although we have considered all of the issues

advanced by Holley and Haass, we will not discuss some of the more

meritless points that have been raised.  We affirm the appellants's

convictions, but vacate the district court's restitution order.

## I. Background

Appellants Holley and Haass were the co-owners and two of the principal officers of Peoples, a state chartered, federally insured financial institution in Llano, Texas. In 1985, Peoples was beset by financial difficulties. Specifically, the appellants were growing increasingly concerned about the amount of Real Estate Owned ("REO")--property to which Peoples had acquired title--that appeared on Peoples's balance sheets. Peoples's REO, acquired primarily through foreclosure, included two apartment buildings in San Angelo, Texas and another apartment building in San Antonio, Texas. Because the market value of these apartments was declining, the appellants wished to sell these properties as soon as possible. More importantly, by selling the buildings, the appellants would avoid having to infuse capital into Peoples.[1] Thus, in mid-1985, Haass and Lloyd Kitchen, an officer of Peoples, opened negotiations with James McClain, a potential buyer of Peoples's REO.

Meanwhile, Holley and Eileen Marcus, a real estate broker, entered into an arrangement to engage in real estate transactions in and around Dallas, Texas. Under this arrangement, Marcus was to find various properties that she and Holley could purchase and then resell, and Holley was to obtain the necessary financing. In the fall of 1985, Marcus raised with Holley the possibility of

---

[1]Federal regulations require federally insured financial institutions such as Peoples to maintain a certain minimum net worth. If such an institution has too many troubled assets, such as Peoples's REO, the institution's net worth can fall below the required levels. The institution may then be required to acquire additional investments of capital.

purchasing the Arapaho Station Shopping Center ("Arapaho Station") in Richardson, Texas.[2]  Holley demonstrated an interest in Arapaho Station.   Holley and Marcus intended to purchase Arapaho Station and realize a quick profit by immediately reselling the property to a buyer at a price above what they had paid.  Such a transaction is often called a "flip" of the property.  On October 14, 1985, Marcus signed a contract to purchase Arapaho Station for $5,500,000, but this contract was never closed.

On November 27, 1985, Holley entered into a contract of his own to purchase Arapaho Station for $5,500,000.  This contract called for a $100,000 letter of credit as earnest money.  The amount of earnest money required was later raised to $110,000. Meanwhile, Dallas real estate agent Jerri Cook showed Arapaho Station to Jerry Ezell, an employee of Jim McClain.  Holley then met with McClain to discuss a flip of Arapaho Station.  McClain became interested when he learned that the potential profit from this transaction could be as high as $ 3 million.

The other major characters in this case were Cliff Brannon and Don Jones.   Brannon and Jones owned Security Savings Association ("Security"), a state chartered, federally insured financial institution in Plano, Texas.  In 1983, Holley and Haass entered into an arrangement with Brannon and Jones whereby Peoples and Security would make personal loans to the owners of the other institution without requiring any security or without inquiring

---

[2]The owners of Arapaho Station at that time were involved in litigation.  The property was controlled by a court-appointed receiver who was searching for a buyer for the shopping center.

into the adequacy of the collateral for the loans. The purpose of this arrangement was to evade regulations that limit the amount of loans that a savings and loan can make to its owners. Several million dollars in loans were extended through this arrangement.

In 1985, Security also experienced financial difficulties. One drain on Security's financial condition was a piece of REO called Executive Square. Security's ownership of Executive Square created the same problems for Security that Peoples's ownership of its REO created for Peoples. On December 11, 1985, Holley and Haass met with Brannon and Jones to formulate an agreement through which Peoples and Security could remove some of their REO from their books. Also present at this meeting were Peoples's president Joel Daniel, Lloyd Kitchen, Jim McClain, and Jerry Ezell. Under this agreement, Peoples would sell its REO apartments to First American Land & Development, Inc. ("First American"), a company wholly owned by McClain, and extend to First American a loan for the purchase price of those buildings. At the same time, Security would sell Executive Square to First American, also extending a loan for the purchase price of that property. To recognize these deals as the sale of Peoples's and Security's REO, applicable regulations required First American to provide a 10% down payment for each transaction. To satisfy this requirement, the appellants and Brannon and Jones agreed that Peoples and Security would issue a letter of credit to serve as the down payment for the sale of the other institution's REO to First American. At this meeting, the

4

participants also discussed Holley's planned sale of Arapaho Station to McClain.

Later, on December 20, 1985, Holley assigned his contract to purchase Arapaho Station to City Group, Inc. ("City Group"), a shell corporation owned by McClain, for ten dollars. Peoples then issued the required $110,000 earnest money letter of credit to the receiver of Arapaho Station. However, this letter of credit had not been approved and was not supported by an obligation requiring City Group to repay Peoples. That evening, Haass and McClain negotiated an illicit "consulting fee" to be paid by McClain to Holley. Testimony at trial revealed that, during this meeting, Haass spoke to Holley on the telephone about the amount of this "fee." Further, Haass revealed that Holley had agreed to assign the fee to him in order to pay debts that Holley owed him. At the conclusion of the meeting between Haass and McClain, McClain presented Haass with a letter in which he (McClain) agreed to pay Holley $662,000, purportedly for the assignment of the Arapaho Station Contract, on the condition that the deal close by January 8, 1986.

The sale of Arapaho Station did not close on January 8, 1986 as required by the contract. On January 30, 1986, an attorney for the receiver of Arapaho Station presented the $110,000 letter of credit to Peoples for payment. When the attorney arrived at Peoples's offices, Joel Daniel telephoned Haass and McClain. Haass insisted that the letter of credit "couldn't be called [because] it wasn't any good." McClain said that he would not reimburse Peoples

5

for the payment of the letter of credit. Peoples paid the letter of credit and, the next day, set up a loan on its books to City Group to cover the outlay of funds. This supposed loan was not supported by any promissory note or other specific document from City Group or McClain.

In February of 1986, the receiver of Arapaho Station entered into a contract to sell the shopping center to City Group for $5,500,000. McClain abandoned his hope of realizing a quick profit through a flip of Arapaho Station. Instead, the Arapaho Station transaction and the transaction involving McClain's "purchase" of Peoples's and Security's REO were arranged so that, in exchange for the "purchase" of Peoples's REO apartments, McClain would receive financing from Peoples for the purchase of Arapaho Station as well as approximately $ 500,000 in cash. Moreover, Haass agreed that McClain need not make any payments on the loans that his companies received from Peoples.

These transactions, designed to remove REO from Peoples's and Security's balance sheets, closed over a three-day period in February of 1986. Peoples sold its three REO apartment buildings to First American for $11,020,000, simultaneously loaning First American the purchase price for these buildings. The down payment for this purchase was a $1.6 million letter of credit issued by Security and secured by a second deed of trust on the REO apartments and on Arapaho Station.[3] Since the letter of credit

---

[3]McClain testified that the apartments and the shopping center were "over-loaned" in comparison to their real value and that the properties therefore provided no real collateral.

down payment exceeded 10% of the purchase price, Peoples was allowed to remove the apartments from its REO holdings listing. At the same time, Security sold its REO property, Executive Square, to First American for $6.5 million. Security also simultaneously loaned First American the purchase price of this building. The down payment for the purchase of Executive Square was a $650,000 letter of credit issued by Peoples. Brannon testified that both Holley and Haass agreed to Peoples's issuance of the $650,000 letter of credit to Security. This letter of credit was secured by a second deed of trust on Executive Square.[4]

During the February closing, City Group also purchased Arapaho Station for $5.5 million and immediately resold it to First American for the same amount. Peoples loaned First American $6,650,000 for the purchase of Arapaho Station. McClain and his companies received approximately $500,000 of the loan proceeds, including a $220,000 "commission" paid to Santa Fe Real Estate Development Corporation, a corporation controlled by McClain that had no role in the transactions. Neither McClain nor any of his companies contributed anything of value to the transactions.

Peoples's board of directors approved the issuance of the $650,000 letter of credit to Security on February 20, 1986; the board approved the loans to First American on March 20, 1986. Holley and Haass were present at both meetings. McClain made no payments on the loans that First American received from Peoples.

---

[4]McClain also testified that Executive Square was worth, at most, 50% of the loan amount and that it provided no real collateral for the letter of credit issued by Peoples.

7

On December 29, 1988, Peoples was placed into receivership by the FSLIC. Texas Asset Trust eventually acquired the assets of Peoples and sold the three apartment buildings and Arapaho Station at a substantial loss. Having described these economic gyrations, we are now prepared to examine how the law applies to these financial somersaults.

## II. Proceedings Below

In eight counts of a nine count federal indictment, a grand jury charged Holley and Haass with various offenses stemming from these transactions. The first count charged the appellants with conspiracy under 18 U.S.C. § 371, alleging that Holley and Haass schemed to (1) corruptly demand and agree to receive something of value in connection with Peoples's business in violation of the federal bank bribery law, 18 U.S.C. § 215, (2) execute a scheme to defraud Peoples in violation of 18 U.S.C. § 1344, and (3) misapply Peoples's funds in violation of 18 U.S.C. § 657. Count Two charged Holley and Haass with bank bribery, alleging that the appellants corruptly demanded and agreed to receive $662,000 from McClain in connection with Peoples's business. Count Three accused Holley and Haass of executing a scheme to commit bank fraud by agreeing with the owners of Security--Brannon and Jones--to extend loans to one another without inquiring into the collateral for the loans. This scheme included the agreement between the appellants and Brannon and Jones to issue letters of credit for the benefit of each other's financial institution for the down payment for the sale of the other institutions's REO. Count Four charged Holley with the

8

fraudulent issuance of a bank obligation. Counts Five through Eight alleged various acts of misapplication of Peoples's funds.

After a jury trial, Holley and Haass were each convicted on the conspiracy count (Count One) and the bank fraud count (Count Three). Haass was convicted of bank bribery (Count Two), and Holley was convicted of aiding and abetting this offense. Haass was also convicted on three counts of misapplication of bank funds (Counts Six, Seven, and Eight) and of aiding and abetting the misapplication of bank funds (Count Five).[5] The district court sentenced both men to serve terms of imprisonment and ordered them to pay almost $6 million, jointly and severally, to the Federal Deposit Insurance Corporation ("FDIC") as restitution. We now turn to the appellants's meanderings and contentions.

## III. The Sufficiency of the Evidence

Holley challenges the sufficiency of the evidence to support his convictions. As always, our assessment of the sufficiency of the evidence is deferential to the jury's verdict. We will affirm the jury's decision if, "viewing the evidence and the inferences that may be drawn from it in the light most favorable to the verdict, a rational jury could have found the essential elements of the offenses beyond a reasonable doubt." United States v. Pruneda-Gonzalez, 953 F.2d 190, 193 (5th Cir.), cert. denied, 112 S. Ct. 2952 (1992); Jackson v. Virginia, 443 U.S. 307, 319 (1979). "[I]t

---

[5]The jury acquitted Holley on the one count of fraudulent issuance of bank obligations (Count Four) and the one count of misapplication of bank funds (Count Eight) with which he was charged.

9

is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt."  United States v. Stephens, 964 F.2d 424, 427 (5th Cir. 1992).

Holley first contends that there is insufficient evidence to support his conviction for aiding and abetting bank bribery.  To sustain a conviction for aiding and abetting in violation of 18 U.S.C. § 2, the Government must show beyond a reasonable doubt that Holley associated with a criminal venture, participated in that venture, and sought by his action to make that venture succeed.  United States v. Murray, 988 F.2d 518, 522 (5th Cir. 1993); United States v. Parekh, 926 F.2d 402, 406 (5th Cir. 1991).  Under this formulation of the Government's burden, to "associate" means to "share[] in the criminal intent of the principal."  Murray, 988 F.2d at 522.  To "participate" means to "engage[] in some affirmative conduct designed to aid the venture."  Id.

The "criminal venture" that Holley was convicted of aiding and abetting was Haass's bank bribery.  Specifically, the jury found Holley guilty of aiding and abetting Haass in his solicitation of a $662,000 "consulting fee" from McClain.  Holley insists that the evidence failed to show that he knew of or participated in the solicitation of the December 20, 1985 letter from McClain promising to pay Holley a fee of $662,000.  However, McClain testified at trial that Haass telephoned Holley and

10

discussed with him the negotiations for and the amount of the "fee." The jury was entitled to credit this testimony and conclude that Holley thereby aided and abetted Haass's bank bribery. We affirm Holley's conviction for aiding and abetting.

Holley next argues that there is insufficient evidence to support his conviction for bank fraud. Again, we disagree. There was ample evidence that Holley was involved in the agreement to extend loans and letters of credit from Peoples to Brannon and Jones without inquiring into the collateral for these loans. This arrangement exposed Peoples to at least a risk of loss. Exposing a financial institution to a risk of loss is sufficient to support a bank fraud conviction. United States v. Barakett, 994 F.2d 1107, 1111 (5th Cir. 1993) ("We have recognized that knowing execution of schemes causing risk of loss--rather than actual loss--to the institution, can be sufficient to support [a] conviction" under § 1344), cert. denied, 114 S. Ct. 701 (1994); United States v. Saks, 964 F.2d 1514, 1519 (5th Cir. 1992) (same); United States v. Lemons, 941 F.2d 309, 316 & n.3 (5th Cir. 1991) (same). Thus, Holley's conduct is sufficient to support a conviction for bank fraud. Holley asserts that since Brannon and Jones had significant personal resources, "no one would expect a loss to Peoples from such loans." This assertion does not aid Holley. We recently reiterated that "the credit worthiness of a borrower will not insulate a bank officer from charges of bank fraud." United States v. Henderson, 19 F.3d 917, 924 (5th Cir. 1994) (citing Saks, 964 F.2d at 1519). Holley also maintains that he was not involved in

11

the bank fraud because he had resigned as chairman of Peoples before the February 1986 transactions closed. However, the evidence showed, and the jury was entitled to find, that Holley was aware of and participated in the transactions that defrauded Peoples. Holley participated in the December 11, 1985 meeting at which the exchange of letters of credit between Peoples and Security to provide for the down payments for First American's purchase of Peoples's and Security's REO was planned, and evidence showed that Holley agreed to this arrangement. Moreover, although Holley resigned as chairman of Peoples in December of 1985, he was elected vice-chairman of Peoples in January of 1986 and participated in board meetings at which Peoples's loans to First American for the purchase of Peoples's REO and Arapaho Station were approved. Holley's resignation did not eliminate his participation either before or after December of 1985. The jury was entitled to conclude that Holley was guilty of bank fraud. We therefore affirm Holley's bank fraud conviction.

Finally, Holley claims that the evidence is insufficient to sustain his conspiracy conviction. This attack is in part based on his earlier contentions that the evidence was insufficient to support his bank fraud and aiding and abetting bank bribery convictions. We rejected Holley's challenges to these convictions. Thus, to the extent that Holley's challenge to his conspiracy conviction is based on his attacks on his bank fraud and bank bribery convictions, it must necessarily fail. Moreover, our

12

review of the record convinces us that there was sufficient evidence to convict Holley of the conspiracy charged.

## IV.   Jury Charge Issues

### A. The Reference to Intangible Rights in the Bank Fraud Charge

The third count of the Government's indictment charged the appellants with violating the federal bank fraud statute, 18 U.S.C. § 1344.  This statute criminalizes the execution or the attempted execution of "a scheme or artifice--

> (1) to defraud a financial institution; or
> (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises."

In its instructions to the jury on this count, the district court defined a "scheme to defraud" to be "any scheme to deprive another of money, property, or of <u>the intangible right to honest services</u> by means of false or fraudulent pretenses, representations, or promises." (emphasis supplied).  Noting that the phrase "intangible right to honest services" does not appear in the bank fraud statute, both appellants contend that the district court's use of this phrase in the jury charge allowed convictions for conduct not within the scope of the law.  The appellants claim that this error <u>ipso</u> <u>facto</u> requires reversal of both their bank fraud and conspiracy convictions.  We do not agree.

The appellants's argument is rooted in <u>McNally v. United States</u>, 483 U.S. 350 (1987).  In that case, the Supreme Court held

13

that the federal mail fraud statute, 18 U.S.C. § 1341,[6] did not apply to schemes to deprive citizens of their intangible right to honest government services, but was instead limited to the protection of money and property rights. In 1988, Congress legislatively overruled McNally by enacting 18 U.S.C. § 1346 and defining a scheme to defraud to include a scheme "to deprive another of the intangible right of honest services." However, this statute does not--indeed, cannot--apply retroactively. United States v. Loney, 959 F.2d 1332, 1335 n.6 (5th Cir. 1992). The appellants contend that the Supreme Court's reading of the mail fraud statute applies to the bank fraud statute. The appellants thus reason that a scheme that took place before the enactment of § 1346 and that only deprived a financial institution of the intangible right to honest services is not covered by the bank fraud statute. The appellants therefore claim that since the offenses with which they were charged occurred before the enactment of § 1346, the reference to intangible rights in the trial court's instructions was erroneous and requires reversal of their bank fraud convictions.

At first glance, it appears as though our first task is to decide whether the Supreme Court's interpretation of the mail fraud statute in McNally applies to the bank fraud statute. However, in

---

[6]Employing language that closely resembles the bank fraud statute, the federal mail fraud statute prohibits the use of the mails to execute "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . ." 18 U.S.C. § 1341.

14

_Saks_ we held that, even assuming that _McNally_'s interpretation of the mail fraud statute applies to the bank fraud statute, the inclusion of the intangible rights language in a court's jury charge on a bank fraud count is harmless beyond a reasonable doubt in cases in which the "`"bottom line" of the scheme or artifice [charged] had the inevitable result of effecting monetary or property losses.'" _Saks_, 964 F.2d at 1521 (quoting _United States v. Asher_, 854 F.2d 1483, 1494 (3d Cir. 1988), _cert_. _denied_, 488 U.S. 1029 (1989)). As we observed in _Saks_, this formulation of the approach to such cases is a specific application of the general principle that "`[a]n erroneous instruction on an element of the offense can be harmless beyond a reasonable doubt, if, given the factual circumstances of the case, the jury could not have found the defendant guilty without making the proper factual finding as to that element.'" _Id_. (quoting _United States v. Doherty_, 867 F.2d 47, 58 (1st Cir.), _cert_. _denied_, 492 U.S. 918 (1989)).

Thus, if the inevitable result of Holley and Haass's scheme was to defraud Peoples of money or property interests, then we will find the alleged error in the jury charge to be harmless beyond a reasonable doubt and affirm the appellants's convictions for bank fraud. We are persuaded that, as in _Saks_, the jury could not have found that the scheme proved at trial deprived Peoples of the intangible right to honest services without there being implicit in that finding a finding that the scheme defrauded the institution of money or property interests. The appellants were engaged in a scheme to defraud Peoples by causing that institution to make loans

15

to Brannon and Jones without inquiring into the collateral for the loans. This scheme had the inevitable, inescapable, and unavoidable result of exposing Peoples to at least a risk of loss. Such conduct is sufficient to support a conviction under § 1344. See, e.g., Barakett, 994 F.2d at 1111 & n.15. Therefore, the jury could not have concluded that the appellants intended to defraud Peoples of its intangible right to honest services without also finding that Holley and Haass knowingly exposed the institution to a risk of financial loss. Though the appellants may have deprived Peoples of its right to honest services, any such deprivation was incidental to the appellants's scheme to fraudulently extend loans to Brannon and Jones. The conclusion we reached in Saks is equally applicable here: "The jury's guilty verdict on the bank fraud count reflects a reasoned judgment that [the defendants] participated in the scheme with full knowledge not only that [they] were acting dishonestly, but also that the scheme had _financial_ consequences." Saks, 964 F.2d at 1522 (emphasis in original).

The appellants contend that Saks is distinguishable because the defendants in that case failed to object to the jury charge and therefore could only argue that the trial court's inclusion of the intangible right language was plain error. The appellants observe that, since they objected to the district court's jury charge, we are not limited to such a deferential standard of review. However, we do not believe that this distinction is meaningful in this case. Although there may have been an error in the jury charge, Saks and the cases upon which it relied convince us that any error inherent

16

in the inclusion of the intangible rights language in the jury charge is harmless beyond a reasonable doubt. Id. at 1521; Doherty, 867 F.2d at 57-58.

We cannot end our discussion of this issue without making one final observation. At oral argument, the Government conceded that it believed that the inclusion of the intangible rights language in the jury charge was erroneous. Although we have found any such error to be harmless in this case, we cannot disguise our dismay that the Government would knowingly propose a jury instruction that it thought to be wrong. The Government has a special duty to follow the law.

B. Cautionary Instruction on Evidence of Co-Conspirators's Guilt

In his opening statement, the prosecutor mentioned that some of the witnesses who would testify for the Government had pleaded guilty to offenses related to those with which the appellants were charged. After Holley's attorney objected, the district court correctly instructed the jury that any evidence of another person's guilt was not to be considered as evidence of the appellants's guilt. Later, the Government elicited testimony from several witnesses that those witnesses had entered into plea agreements and guilty pleas as a result of their involvement with the appellants in the transactions that were at issue in this case. The district court again instructed the members of the jury that they were not to consider evidence of an accomplice's guilt as evidence of a defendant's guilt. Specifically, the trial judge stated that the fact that some witnesses "have pled guilty or may be guilty is not

17

to influence your decision as to whether or not these two individuals before you [i.e., the appellants] are guilty. That's why you are hearing all the facts and you base that decision on all the facts you will hear now and between the end of the lawsuit [sic]. And so I want to remind you to keep that in mind."

During the charge conference, the appellants requested that an instruction similar to the ones previously given be included in the court's final charge to the jury. The district court rejected this request. Both appellants contend that the refusal to include in the final jury charge an instruction that the jury was not to consider evidence of an accomplice's guilty plea as proof of the appellants's guilt is reversible error.

We have repeatedly held that, although evidence of an accomplice's guilty plea can be prejudicial, the admission of such evidence may allowed if it serves a legitimate purpose and is coupled with a cautionary jury instruction. United States v. Coleman, 997 F.2d 1101, 1104-05 (5th Cir. 1993), cert. denied, 114 S. Ct. 735 & 893 (1994); United States v. Valley, 928 F.2d 130, 133 (5th Cir. 1991). These conditions have been met in this case. The appellants concede that the Government had a legitimate reason for eliciting evidence of the witnesses's guilty pleas. Holley's and Haass's objection, therefore, is that the district court insufficiently instructed the jury to not use this testimony as evidence of the appellants's guilt. However, the district judge gave an appropriate cautionary instruction after the Government's opening statement and during the Government's case-in-chief.

18

The appellants's argument is thus reduced to the contention that the district court erred when it refused to include a similar instruction in the final jury charge. We disagree. The trial court sufficiently cautioned the jury when the testimony of the guilty pleas was elicited. Moreover, the appellants did not attempt to deny that violations of the law occurred. The theory of the defense for both appellants was that the witnesses who pleaded guilty were the only ones who committed any crimes. The danger that the jury would that infer the appellants were guilty because others had pleaded guilty to similar charges was diminished by the appellants's own defense. Under these circumstances, the district court's refusal to include a similar instruction in the final jury charge does not require reversal of the appellant's convictions.

While it is plainly the better practice to caution the jury both when evidence of an accomplice's guilty plea is introduced and at the close of evidence, repetition is not a requirement of a definite cautionary instruction. Under the facts of this case, the district court did not abuse its discretion by giving an appropriate instruction during the opening statements and when the guilty plea evidence was introduced. We hesitate to reverse a conviction for the absence of something in the final jury charge that was adequately taken care of earlier in the trial. Cf. United States v. Rewald, 889 F.2d 836, 865 (9th Cir. 1989) (finding no abuse of discretion when the district court gave a cautionary instruction concerning a co-defendant's guilty plea during the

19

final jury instructions rather than when the testimony was elicited at trial), cert. denied, 498 U.S. 819 (1990).

C. Constructive Amendment of the Indictment

Holley contends that the jury charge constructively amended Count Two of the indictment, the bank bribery count, and allowed him to be convicted for conduct not charged in the indictment. First, Holley claims that since the jury charge instructed the jury to convict him if he "demanded something of value in excess of $100", the jury could have convicted him for Haass's solicitation of an improper consulting fee on a previous occasion two years earlier, rather than the $662,000 solicitation that was charged in the indictment. Second, Holley contends that the jury charge allowed the jury to convict him of aiding and abetting someone other than Haass in committing bank bribery, although the indictment only alleged that Holley aided and abetted Haass's bank bribery. Finally, Holley claims that the charge allowed the jury to convict him of soliciting the $662,000 payment for someone other than himself or Haass, even though the indictment alleged that the appellants solicited this payment for themselves. We find no merit to these contentions.

A constructive amendment "occurs when the jury is permitted to convict the defendant upon a factual basis that effectively modifies an essential element of the offense charged." United States v. Doucet, 994 F.2d 169, 172 (5th Cir. 1993); United States v. Baytank, Inc., 934 F.2d 599, 606 (5th Cir. 1991). If we find that the indictment has been constructively amended, we must

20

reverse the conviction. Doucet, 994 F.2d at 172. Here, however, there has been no constructive amendment of the indictment. All of Holley's contentions must fail because the district court instructed the jury that it was to consider only the crime that was charged in the indictment. Moreover, the indictment was read to the jury at the beginning of the trial, and the jury was given a copy of the indictment for use during the deliberations. As to Holley's contention that he could have been convicted for the earlier solicitation of an improper consulting fee, the district court explained to the members of jury that, although evidence of other acts (such as the earlier consulting fee solicitation) had been admitted into evidence at trial, the jury was to consider such evidence only as it bore on the appellants's intent or motive. Furthermore, the Government's closing argument mentioned only the solicitation of the $662,000 payment from McClain. We see no reason to assume that the jurors disregarded the court's charge and based their verdict on conduct that was not charged in the indictment. Accord United States v. Stone, 960 F.2d 426, 432 (5th Cir. 1992).

## V. Impeachment Evidence

Holley next argues that the district court erroneously admitted several pieces of impeachment evidence. Only two of Holley's contentions merit discussion. First, Holley complains that the district court erroneously allowed the introduction of testimony that the appellants were reported to have received a consulting fee two years prior to the offenses alleged in the

21

indictment.  Second, Holley complains of the admission of evidence that the FDIC had to cover the losses that Peoples suffered.  We employ a heightened abuse of discretion standard to review the district court's decision to admit this evidence.  United States v. Anderson, 933 F.2d 1261, 1268 (5th Cir. 1991).  We find no abuse of discretion.

The testimony that the appellants were reported to have received a consulting fee two years prior to the offenses alleged in the indictment was properly admitted to impeach Haass's direct testimony and as evidence of the appellants's motive and intent. Haass testified that he had never improperly profited from any financial transactions involving Peoples.  He also stated Peoples was placed under the supervision of the Federal Home Loan Bank Board ("FHLBB") in 1984 because of a loan that Peoples had made in Florida.  Federal Rule of Evidence 611(b) allows cross-examination on both the subject matter of the direct examination and matters affecting the credibility of the witness.  On cross-examination, Haass admitted that he and Holley had, in fact, personally profited from a financial transaction involving Peoples by accepting an improper consulting fee in connection with a loan previously made by Peoples. Haass also admitted that this fee was one of the reasons that the FHLBB placed Peoples under supervision in 1984. The Government's elicitation of this admission was thus allowed by Federal Rule of Evidence 611(b) because it was within the scope of Haass's direct examination and because it affected Haass's credibility.  Moreover, the fact that Haass admitted that he was

22

involved in past wrongdoing does not affect Holley. The district court directed the jury to consider the evidence against each appellant separately and independently. The fact that Haass's admission was also evidence of a prior bad act by Holley does not affect our conclusion that this testimony was admissible. This testimony was admissible under Federal Rule of Evidence 404(b) to show Holley's motive or intent with respect to the crimes with which he was charged. The district court instructed the members of the jury that they could consider evidence of such extraneous acts by the appellants only as it bore on their motive or intent.

The admission of evidence that the FDIC had to cover the losses that Peoples suffered does not entitle Holley to a reversal of his conviction. Haass testified that he could not have committed the crimes with which he was charged because his own money was invested in Peoples and therefore at risk if the financial institution failed. Given Haass's assertion, we are sympathetic with the Government's contention that it was entitled to rebut Haass's claim and ask him whether he returned the money that he owed Peoples and whether Peoples's losses would be covered by the FDIC. However, even if we assume that the Government's line of questioning in this case was improper,[7] our review of the record

---

[7]No less an authority than Judge Learned Hand observed that a similar tactic employed by a federal prosecutor was plainly improper. In United States v. Lotsch, 102 F.2d 35 (2d Cir.), cert. denied, 307 U.S. 622 (1939), the defendant, an officer of a national bank, was convicted of illegally receiving commissions from borrowers from his bank. Judge Hand wrote that it was inappropriate for a prosecutor to comment in his closing argument that, since the Government guaranteed the bank deposits in that case, the money that was lent to the borrowers came out of the

convinces us that the effect of these questions does not compel reversal of the convictions. We do not allow every perceivable transgression to justify reversal of a defendant's conviction. Instead, we must make individual judgments and, after reading the record, determine whether the Government's question had a "`substantial impact' on the jury's verdict." United States v. El-Zoubi, 993 F.2d 442, 446 (5th Cir. 1993). We do not believe that the government's questions had such an impact. Holley's alleged evidentiary errors do not entitle him to a reversal of his convictions.

## VI. Production of Interview Notes

Holley maintains that the Government should have produced FBI reports that outlined the content of the Government's interviews with the witnesses who entered into plea bargains. Holley claims that these reports reveal the crimes with which the Government's witnesses could have been charged and that this information could have been used to impeach the credibility of these witnesses. Holley does not allege that these interview notes qualify as "statements" under the Jencks Act, 18 U.S.C. § 3500. Instead, he merely argues that the notes contained material that Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. Unites States, 450

---

jurors's pockets. Nevertheless, under the facts of that case, Judge Hand did not find that that incident required reversal of the defendant's conviction. Id. at 37. See also United States v. Smyth, 556 F.2d 1179 (5th Cir.) (finding improper, but not reversible error, an appeal to the personal prejudices of jurors as taxpayers in case involving conspiracy to defraud the Government), cert. denied, 434 U.S. 862 (1977).

U.S. 150 (1972), and their progeny require to be produced to criminal defendants.

Brady and Giglio hold that the Constitution forbids the Government from suppressing evidence favorable to the accused or useful to the defense for impeachment of witnesses who testify against the accused. United States v. Williams, 998 F.2d 258, 269 & n.25 (5th Cir. 1993), cert. denied, 114 S. Ct. 940 (1994). However, a prosecutor's suppression of such evidence requires reversal of a defendant's conviction only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682 (1985). Here, the district court examined the relevant FBI reports and found that they did not contain discoverable material. We recognize that in situations such as this, much deference should be paid to the trial judge who observed the hours and days of testimony. After reviewing the record and considering Holley's speculation that the FBI reports could have been useful in the cross-examination of several witnesses, we find nothing which leads us to conclude that the district court's conclusion is clearly erroneous. See United States v. Mora, 994 F.2d 1129, 1139 (5th Cir.), cert. denied, 114 S. Ct. 417 (1993).

VII.  The Restitution Award

In its judgment, the district court ordered the appellants to pay the FDIC $ 5,990,330.21 in restitution under the Victim

25

Witness Protection Act ("VWPA"), 18 U.S.C. §§ 3663-3664. This restitution order was based solely on the loss that resulted from the loan that Peoples extended to First American to finance the purchase of Arapaho Station. The appellants contend that the district court's calculation of the loss caused by the Arapaho Station loan was improper. We agree.

First American defaulted on the Arapaho Station loan shortly after Peoples entered into that transaction. Indeed, no payments were ever made on that loan. Peoples foreclosed on Arapaho Station in April of 1987 and acquired the property at the trustee's sale shortly thereafter. Texas Trust, the entity that later acquired Peoples's assets, finally sold the property in January of 1993. A witness testified that the loss caused by the Arapaho Station loan totalled $5,990,330.21. However, this calculation of the loss included the decline in value that Arapaho Station suffered between the time that Peoples purchased the property at auction in 1987 and the time that Texas Trust sold it in 1993. The appellants contend that the district court improperly included the decline in value that occurred after Peoples recovered title to Arapaho Station in the amount of restitution ordered. The appellants claim that any such loss stemmed from a decision by the new owners to retain possession of the building. We review such a challenge to the legality of a restitution order de novo. United States v. Chaney, 964 F.2d 437, 451-52 (5th Cir. 1992).

Under the VWPA, the victim of a federal criminal offense can recover the losses sustained "as a result of the offense." 18

U.S.C. § 3664(a). In cases that involve damage to or loss or destruction of property, a court may order return of the property. 18 U.S.C. § 3663(b)(1)(A). If return of the property is in any way inadequate, a court may order the defendant to pay "the value of the property on the date of the . . . loss . . . less the value (as of the date the property is returned) of any part of the property that is returned." 18 U.S.C. § 3663(b)(1)(B)(i). In the present case, we must decide when the property that was lost was returned. The appellants contend that the property was returned when Peoples purchased Arapaho Station at the trustee's sale. The appellants thus maintain that they should receive a credit for the value of Arapaho Station as of the date title to the shopping center was transferred to Peoples. The Government claims that the "property" that was lost was Peoples's capital and that the return of Arapaho Station to Peoples represents only the return of the collateral for the actual property involved in this case--the funds that Peoples delivered to First American. The government insists that the property involved in this case was not returned until Peoples's successor, Texas Trust, sold Arapaho Station for cash and regained a portion of the funds that First American had fraudulently obtained from Peoples.

The parties's contentions present interesting questions that stem in part from the fungible character of the property involved in this case. However, we believe that an opinion recently delivered by a panel of this Court properly dictates the result that we must reach. In United States v. Reese, 998 F.2d 1275 (5th

27

Cir. 1993), we explained that "it would appear that the `property' as to which [the savings and loan] might have suffered `damage to or loss or destruction of' could only be loan proceeds funded in cash at the original closing of [the improperly extended] loan." Id. at 1283. However, we also explained that when the real property that secures such a loan is deeded back to the financial institution, "the value of such property should constitute a partial return of the `cash loan proceeds.'" Id. at 1284.

In United States v. Smith, 944 F.2d 618 (9th Cir. 1991), cert. denied, 112 S. Ct. 1515 (1992), the Ninth Circuit confronted a situation directly analogous to the one we confronted in Reese and reached the same conclusion. In Smith, a defendant who had been convicted of bank fraud was ordered to pay restitution to the FSLIC for the losses caused by fraudulently obtained loans. The Smith court held that the defendant "should receive credit against the restitution amount for the value of the collateral property as of the date title to the property was transferred" to the FSLIC's successor. Id. at 625. The court reasoned that, as of that date, "the new owner had the power to dispose of the property and receive compensation." Id. The Smith court concluded that the value of the returned property "should therefore be measured by what the financial institution would have received in a sale as of that date. Any reduction in value after [the defendant] lost title to the property stems from a decision by the new owners to hold on to the property." Id.

Since the district court failed to account for the fact that the property that was lost was returned when Peoples purchased Arapaho Station in 1987, <u>Reese</u> requires us to vacate the restitution order and remand this case for recalculation of the amount of restitution.

## VIII.  Conclusion

The appellants's convictions are AFFIRMED.  The order of restitution is VACATED.  This case is remanded for further proceedings consonant with this opinion.